[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 563 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 564 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 565 
The appellant was convicted of the capital murder for pecuniary gain of Elizabeth Dorlene Sennett. The appellant's motion for change of venue was granted, transferring the case from Colbert County, Alabama, to Jefferson County, Alabama, for trial. Following the jury's verdict of guilt, a sentencing hearing was held before the jury, which resulted in an advisory sentence of death. A separate sentencing hearing was thereafter conducted before the trial court, following which the appellant was sentenced to death.
The record indicates that the victim, Elizabeth Dorlene Sennett, was married to Charles Sennett, a Church of Christ minister. Charles Sennett had suffered from mental problems in the past, and, at the time of the offense, was having an extra-marital affair and was having financial difficulties. The evidence at trial indicated that Charles Sennett solicited Billy Gray Williams to kill his wife or to arrange to have his wife killed, in return for pecuniary consideration. Thereafter, Billy Williams approached the appellant concerning the matter. Although it is unclear whether the appellant initially believed that the proposition was merely to beat and to scare the victim, evidence revealed that, at least three days prior to the offense, the appellant was aware that he was expected to kill the victim. The appellant attempted to solicit a third party to participate in the offense; however, the party declined. The appellant then approached John Forrest Parker, who agreed to participate in the offense. Although he did not know the *Page 566 
Sennetts' names, the appellant met with Charles Sennett and Billy Williams prior to the offense.
On the day of the offense, the appellant and John Parker drove to the Sennetts' residence. The victim, Elizabeth Sennett, was home alone. The two men knocked on the door and informed Elizabeth Sennett that they had been told by her husband that they could explore the Sennetts' property, because they wanted to hunt on the land. Elizabeth Sennett had the two men wait while she called her husband to verify their story. Charles Sennett apparently told his wife to allow them to walk around the property. Elizabeth Sennett remained inside the house while the two men walked around behind the property and, according to the appellant's statement, drove down the road and then returned. The men again knocked on the door and asked Elizabeth Sennett if they could use the bathroom and get some water. Elizabeth Sennett allowed them into the house and, while John Parker was in the bathroom, the appellant talked to Mrs. Sennett. John Parker approached Elizabeth Sennett from the rear and "blind-sided her." A beating then ensued, in which the victim apparently struggled for her life. The evidence indicated that during the beating any item within reach was used as a weapon. The men apparently used every piece of a fireplace set, a walking cane, and a piece of galvanized pipe and, after beating her, stabbed her eight times with a survival knife. Several of these weapons, or pieces thereof, including the survival knife, were later found in a pond located behind the Sennetts' residence. Although it is unclear whether both or only one of the men participated in the beating and subsequent stabbings, it is clear that both men were present and aiding in the offense.
In the appellant's statement, he indicated that they were told to make the offense look like a burglary "gone bad," and that therefore the men took a videocassette recorder and a stereo. Shortly after the killing, Charles Sennett returned to the house and telephoned the sheriff's office to report that someone had broken into his house and had killed his wife. A week later, when the investigation began centering around him, Charles Sennett killed himself. Billy Williams, John Parker, and the appellant were each paid $1000 by Charles Sennett for their participation in the offense.
 I
The appellant argues that the State failed to present sufficient evidence to sustain his conviction of capital murder. Specifically, the appellant argues that the State failed to meet its burden of proof with respect to the element of pecuniary gain. The appellant admitted in his statement that he was to receive $1000 for the commission of the offense and that he was paid $200 in advance and that following the offense he received the remainder. However, the appellant argues that there was no independent proof of this element sufficient to allow this statement into evidence. See Bracewell v. State,506 So.2d 354 (Ala.Cr.App. 1986).
The State presented evidence through the testimony of one of the appellant's friends, who stated that he had known the appellant since kindergarten and had visited him daily. He testified that he had gone to the appellant's house the day after the murder and had noticed that the appellant had an unusually large amount of money. He testified that he believed that the money was in $20 denominations. He testified that he had never seen the appellant with that much money previously and that the appellant had told him that the money was from an income tax refund.
Another witness for the State, who testified that he was a close friend of the appellant's, stated that prior to the offense the appellant had solicited him to participate in the offense. The appellant told him that he knew where they could make some "fast cash," because a man needed someone "to hurt his old lady or something like that."
"Independent evidence of the corpus delicti need not be of such probative strength as that such evidence, standing alone, in the opinion of the trial or appellate court, would, ought to or probably would satisfy the jury beyond a reasonable doubt of the *Page 567 
existence of the corpus delicti." C. Gamble, McElroy's AlabamaEvidence § 304.01 (4th ed. 1991). Circumstantial evidence, as well as direct evidence, may provide this independent proof.Henderson v. State, 584 So.2d 841 (Ala.Cr.App. 1988).
 " '[T]he corpus delicti is a fact, proof of which may be established by circumstantial evidence, and if there is a reasonable inference to prove its existence the court should submit to the jury for consideration the question of the sufficiency and weight of the evidence tending to support that inference.' Hines [v. State, 260 Ala. 668, 671, 72 So.2d 296, 298 (1954)]. " 'Positive, direct evidence of the corpus delicti is not indispensable for the admission of confessions. Whenever facts and circumstances are proven from which a jury might legally infer that the offense has been committed, the confessions are admissible." ' Snead
[v. State, 251 Ala. 624, 627, 38 So.2d 576, 579
(1948)] (quoting Ryan v. State, 100 Ala. 94, 95, 14 So. 868 (1894)).
 " 'It is a well-settled rule that a confession is not admissible until the corpus delicti is first proven. But if any facts are shown from which the jury may reasonably infer that the crime has been committed, any other evidence tending to implicate the accused is thereby rendered admissible.
" 'It is also settled that —
 " ' "Inconclusive facts and circumstances tending prima facie to show the corpus delicti may be aided by the admissions or confessions of accused so as to satisfy the jury beyond a reasonable doubt, and so to support a conviction, although such facts and circumstances, standing alone, would not thus satisfy the jury of the existence of the corpus delicti." Hill v. State, 207 Ala. 444, 93 So. 460; Matthews v. State, 55 Ala. 187; Ryan v. State, 100 Ala. 94, 14 So. 868; 16 Corpus Juris, § 1514, p. 737.'
 "Arthur v. State, 19 Ala. App. 311, 312, 97 So. 158, 159 (1923). See also Ratliff v. State, 212 Ala. 410, 412, 102 So. 621, 623 (1924)."
Howell v. State, 571 So.2d 396, 397 (Ala.Cr.App. 1990).
In the present case, it is undisputed that the victim was brutally beaten and stabbed to death. Moreover, the appellant's involvement is undisputed, although the appellant contested the extent of his involvement. The State has presented ample evidence to tie the appellant to the offense and to show that the victim was intentionally killed pursuant to a murder for hire. See Henderson v. State, supra. Therefore, we find that the State's evidence was sufficient to sustain the appellant's conviction and to allow the appellant's confession into evidence.
 II
The appellant argues that the trial court's jury instructions on reasonable doubt violated the due process clause of the constitution. The appellant cites Cage v. Louisiana, ___ U.S. ___, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), in support of his argument. In that case, the United States Supreme Court held that an instruction on reasonable doubt impermissibly suggested a higher degree of doubt than is required for acquittal under the reasonable doubt standard of In re Winship, 397 U.S. 358,364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). The instructions given in Cage stated, in pertinent part:
 " 'If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. It must be such doubt as would give rise to a grave uncertainty, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. It is an actual *Page 568 substantial doubt. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a moral certainty.' State v. Cage, 554 So.2d 39, 41
(La. 1989)."
___ U.S. at ___, 111 S.Ct. at 329. (Emphasis in Cage.) In holding that this instruction did not comply with In reWinship, supra, the United States Supreme Court stated:
 "In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole. Francis v. Franklin, 471 U.S. 307, 316, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344 (1985). The charge did at one point instruct that to convict, guilt must be found beyond a reasonable doubt; but it then equated a reasonable doubt with a 'grave uncertainty' and an 'actual substantial doubt,' and stated that what was required was a 'moral certainty' that the defendant was guilty. It is plain to us that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When those statements are then considered with the reference to 'moral certainty,' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause."
Cage v. Louisiana, ___ U.S. at ___, 111 S.Ct. at 329-30.
In the present case, the trial court instructed the jury, in pertinent part, as follows:
 "The phrase 'reasonable doubt' is self-explanatory and efforts to define it do not always clarify the term. But it may help you some to say that the doubt which would justify an acquittal must be an actual and substantial doubt and not a mere possible doubt. A reasonable doubt is not a mere guess or surmise, and it is not a forced or capricious doubt. If, after considering all of the evidence in this case, you have an abiding conviction of the truth of the charge, then you are convinced beyond a reasonable doubt and it would be your duty to convict the defendant. The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt, but a reasonable substantial doubt arising from the evidence and remaining after a careful consideration of the testimony, such as reasonable, fairminded and conscientious men and women would entertain under all the circumstances.
Now, you will observe that the State is not required to convince you of the defendant's guilt beyond all doubt, but simply beyond all reasonable doubt and to a moral certainty. If, after comparing and considering all the evidence in this case, your minds are left in such a condition that you cannot say you have an abiding conviction to a moral certainty of the defendant's guilt, then you are not convinced beyond a reasonable doubt, and the defendant would be entitled to an acquittal."
(Emphasis added.)
The question of exactly what language would possibly cause a jury instruction to lead a juror to believe that a lesser degree of proof was required was further clarified by the United States Supreme Court in a memorandum decision in which the Court denied certiorari. Gaskins v. McKellar, ___ U.S. ___,111 S.Ct. 2277, 114 L.Ed.2d 728 (1991). In that memorandum opinion, Justice Stevens wrote:
 "One of the questions presented in the certiorari petition is whether our per curiam
decision in Cage v. Louisiana, ___ U.S. ___ [111 S.Ct. 328, 112 L.Ed.2d 339] (1990), announced a new rule. This question, however, would only be presented by the record if the instructions in this case contained the same flaw as the instructions in Cage. In Cage, the jury was instructed that a reasonable doubt 'must be a doubt as would give rise to a grave uncertainty. . . .' Id. at ___ [111 S.Ct. at 329]. Because the instructions to the jury in this case did not contain the improper language, the question *Page 569 
whether Cage announced a new rule is not actually presented here. For this reason, I think the Court has correctly decided not to grant certiorari to review that question."
Id.
Similarly, in the present case, the language concerning "grave uncertainty," which was condemned in Cage v. Louisiana, supra, was not present. Moreover, "[t]his court has previously held that the mere use of some terminology which happened to also appear in Cage does not necessarily constitute reversible error. See, Williams v. State, [Ms. 89-191, June 14, 1991], 1991 WL 119358 (Ala.Cr.App. 1991); Adams v. State,587 So.2d 1265 (Ala.Cr.App. 1991)." Earhart v. State, [Ms. 90-72, August 23, 1991], 1991 WL 184480 (Ala.Cr.App. 1991). Thus the trial court's instructions to the jury concerning the reasonable doubt standard in the present case was proper.
 III
The appellant argues that the prosecutor made a number of improper comments during his closing arguments in the guilt and sentencing phases of the appellant's trial, which violated his rights to due process, to a fair trial, and to a reliable determination of sentence. The appellant refers to seven comments made by the prosecutor during his closing argument at the guilt phase, which the appellant argues were improper. No objections were made to any of these comments, thus they constitute reversible error only if they constitute plain error, as defined by Rule 45A, A.R.App.P.
The appellant argues that the prosecutor and the assistant prosecutor, in their initial remarks to the jury, emphasized their roles as representatives of the State. The record indicates that the prosecutor and the assistant prosecutor thanked the jurors for their service and referred to the fact that they represented the State and that the two defense attorneys represented the appellant. The Alabama Supreme Court has previously held that an argument of a prosecutor in a criminal case, wherein he explains his relation to organized society and his duty in the prosecution of the case, was not erroneous. Gallant v. State, 167 Ala. 60, 63, 52 So. 739, 741
(1910). Therefore, we find no error in the prosecutor's comment.
The appellant submits that the prosecutor argued facts that were not in evidence, but with which he was acquainted due to his superior knowledge of the case. Specifically, the appellant refers to the comments, "I know she made a lot more photographs than the ones that are included here." The record indicates that the prosecutor was referring to a physician's autopsy report and the fact that the report mentioned more photographs than those which were actually offered and admitted into evidence. As the report was admitted into evidence, the appellant was not arguing facts not in evidence. While a prosecutor, during his argument to the jury, may not state facts which are not in evidence, he may comment on the reasonable inferences he has drawn from the evidence and he may draw conclusions from the evidence based on his own reasoning.Johnson v. State, 541 So.2d 1112, 1118 (Ala.Cr.App. 1989).
The appellant claims that the prosecutor improperly referred to defense counsels as "merchants of reasonable doubt." However, the record indicates that this comment was merely a reply in kind to defense counsel's closing argument, which had emphasized that the State had not overcome the reasonable doubt standard. Bui v. State, 551 So.2d 1094, 1111-12 (Ala.Cr.App. 1988), affirmed, 551 So.2d 1125 (Ala. 1989), vacated on other grounds, ___ U.S. ___, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991). The comment was not error. See United States v. Willis,759 F.2d 1486 (11th Cir. 1985), cert. denied, 474 U.S. 849,106 S.Ct. 144, 88 L.Ed.2d 119 (1987) (wherein a prosecutor's description of the defendants' defenses as "incredible and ludicrous" was held not to be inflammatory). See also James v.State, 564 So.2d 1002 (Ala.Cr.App. 1989) (wherein the prosecutor commented, "look at the defendant sitting there smiling after committing the crime"); Watson v. State,398 So.2d 320 (Ala.Cr.App. 1980), *Page 570 
writ denied, 398 So.2d 332 (Ala. 1980), cert. denied,452 U.S. 941, 101 S.Ct 3085, 69 L.Ed.2d 955 (1981) (wherein the prosecutor referred to the defendant as a "bald faced liar"). See also Haywood v. State, 501 So.2d 515 (Ala.Cr.App. 1986) (wherein prosecutor in his closing argument remarked that devious tricks to destroy the truth had occurred during the trial).
The appellant argues that the prosecutor used his experience and expertise to convince the jury of the validity of the State's petition. He cites the following separate comments made by the prosecutor in support of his position:
 "[H]e [the appellant] does in his statement lay pretty much everything on Mr. Parker . . . that's not an unusual thing for a person to do — when they have committed a criminal offense and they committed that offense along with another person. It's quite common to tell that story in the light most favorable to themselves, nothing whatsoever unusual about that."
 "But when they tell the story, they always tell the story in the light most favorable to themselves. They always tell the story in the light most favorable to themselves."
 "It's not an uncommon thing on a scene like this, on a crime scene where a person is still alive to hear this gurgling sound of a person still trying to force air into their lungs."
None of the above-quoted comments are improper. The record indicates that the prosecutor prefaced the first two comments, which referred to the appellant's statement, by remarking to the jury that they should use their common sense in determining that the defendant's statement was not unusual. Moreover, the third comment made by the appellant was a proper inference from the evidence, as a State's expert had testified that, on examining the victim's internal organs following her admission to the hospital, there was some blood in her lungs, which implied that she had continued breathing after she had been internally injured. The expert witness stated that the blood had been forcibly sucked into the lungs; thus, the prosecutor could reasonably infer that the victim had made gurgling sounds in doing so.
 "The prosecutor's statements are not evidence. Henry v. State, 468 So.2d 896, 899 (Ala.Cr.App. 1984), cert. denied, 468 So.2d 902 (Ala. 1985). Further, prosecutors are to be allowed a wide latitude in their exhortations to the jury. Varner v. State, 418 So.2d 961 (Ala.Cr.App. 1982). 'Statements of counsel in argument must be viewed as in the heat of debate and must be valued at their true worth rather than as factors in the formation of the verdict." Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App. 1984)."
Armstrong v. State, 516 So.2d 806, 809 (Ala.Cr.App. 1986).
 "The test of a prosecutor's legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument. Kirkland v. State, 340 So.2d 1139 (Ala.Cr.App.), cert. denied, 340 So.2d 1140 (Ala. 1976). Statements based on facts admissible in evidence are proper. Henley v. State, 361 So.2d 1148
(Ala.Cr.App.), cert. denied, 361 So.2d 1152 (Ala. 1978). A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift and treat the evidence in his own way. Williams v. State, 377 So.2d 634 (Ala.Cr.App. 1979); McQueen v. State, 355 So.2d 407 (Ala.Cr.App. 1978)."
Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App. 1980), writ denied, 398 So.2d 332 (Ala. 1981), cert. denied, 452 U.S. 941,101 S.Ct. 3085, 69 L.Ed.2d 955 (1981).
The appellant argues that the prosecutor improperly commented on the investigation in this case. The prosecutor commented on the good job done by law enforcement officers in investigating the offense. Such comments have been held to be reasonable inferences from the evidence and not to be an improper bolstering of *Page 571 
State's witnesses. Henderson v. State, 584 So.2d 841
(Ala.Cr.App. 1989); Ex parte Waldrop, 459 So.2d 959, 961 (Ala. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050,85 L.Ed.2d 323 (1985).
Moreover, the prosecutor's comment that the testimony of one of the defense witnesses was "astonishing", and his comment that the witness was "trying to mislead" the jury, were proper inferences from the evidence. See Watson v. State, supra, at 328. The prosecutor's comment concerning the reluctance of one of the State's witnesses to testify and the prosecutor's assurance that the witness was telling the truth were also proper. See Lundy v. State, 568 So.2d 399 (Ala.Cr.App. 1990) (wherein the prosecutor's comment, during closing argument in a capital murder prosecution, that State's witnesses were sworn to tell the truth and did tell the truth was held permissible). See also Cross v. State, 536 So.2d 155 (Ala.Cr.App. 1988).
The appellant argues that the prosecutor improperly commented on the appellant's failure to testify, by referring to the State's case as uncontradicted. The appellant cites the following comments made by the prosecutor: "I cannot see that there is anything that contradicts the State's case, the State's evidence in this case"; and "[t]he evidence in this case goes far beyond the possibility of a reasonable doubt." An examination of the context of the prosecutor's statements clearly indicates that the prosecutor was referring strictly to the uncontradicted nature of the evidence presented and could have, in no way, been commenting on the appellant's failure to testify. "A prosecutor has the latitude to comment on the fact that the State's evidence is uncontradicted or has not been denied. Beecher v. State, 294 Ala. 674, 682, 320 So.2d 727, 734
(1975). However, a prosecutor may not make comments that step over the line drawn by the right of a defendant not to testify at trial. Beecher, 294 Ala. at 682, 320 So.2d at 734." Ex parteWilliams, 461 So.2d 852, 853 (Ala. 1984). The Alabama Supreme Court noted in Ex parte Dobard, 435 So.2d 1351, 1359 (Ala. 1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745,79 L.Ed.2d 203 (1984):
 " '[W]here there is the possibility that a prosecutor's comment could be understood by the jury as reference to failure of the defendant to testify, § 6 [Const. of Ala. of 1901] is violated.' Beecher v. State, 294 Ala. 674, 682, 320 So.2d 727, 734 (1975). Additionally we noted in Beecher:
 " 'Where the State's evidence does stand uncontradicted, the prosecutor does have the right to point this out to the jury. In that circumstance the prosecutor could say: "There has been no refutation of any of the evidence presented by the State"; or more simply, "The State's evidence stands uncontradicted," or other appropriate comment to like effect,' Id.
 "We hold that the prosecutor's comments in question could not have been understood as being a reference to the defendant's failure to testify, but rather fall squarely within the approved bounds of Beecher."
Similarly, in the present case, as noted by the prosecutor, the State's evidence was uncontradicted. The appellant never denied involvement in the offense; he only raised the question as to the extent of his involvement. The State, through its evidence, acknowledged that there was no way of knowing which participant had committed which acts, but it proved that the appellant was, in fact, present and involved.
The appellant also argues that the prosecutor improperly insinuated that the defense had a responsibility to produce certain evidence, by commenting that "they can answer questions just like we can . . . you can get them a subpoena and bring them up here and ask them what they know about it." The appellant argues that the prosecutor further erred by commenting that the defendants had not presented any evidence that there was "anything wrong" with the appellant or otherwise explained what had caused him to commit the murder. This latter comment was also a proper reference to the uncontradicted *Page 572 
nature of the State's evidence. Beecher v. State, supra. As to the first comment, the entire context of the comment is as follows:
 "That's not even consistent — if the truck was moved, that's not even consistent with their own theory. And they can't tell you where the truck went; they just want to raise the question and not give you the answer. Well, you know, they can answer questions just like we can. [Defense counsel] says witnesses won't talk to him like they talk to us, but by golly, you can give them a subpoena and bring them up here and ask them what they know about it. They've got subpoena powers just like we do. They could have subpoenaed all of those people with regard to those times if they really wanted to pursue that theory; and we could have, too. But it's immaterial; it doesn't make any difference; there's so much evidence to the contrary that, you know, it's another fantasy."
The prosecutor's comments constituted a reply in kind to the defense counsel's statement during his closing that witnesses would not talk to him, but that they would talk to the prosecutor. See Bui v. State, supra. It should be noted that the prosecutor, in making this comment, also stated that the prosecution could have also called these witnesses. We find no error in the prosecutor's comments.
The appellant argues that the prosecutor improperly commented as follows:
 "You've seen the pictures and they are horrible, they are horrible. And you will have an opportunity if you want to look at them again, certainly to do so. I have been involved in prosecuting now for thirteen years, and I can truthfully say that this case is one of the most gruesome and terrible [cases] that I have ever been involved with. I can say that without any doubt whatsoever. Mrs. Sennett suffered a terrible, terrible death."
This comment was based on a legitimate inference drawn from the evidence and did not constitute an impermissible interjection of the prosecutor's personal opinion. The atrocity of this crime was clearly in evidence through the admission of the pictures, as well as through the testimony of the witnesses to the scene of the crime and the physician's testimony to the condition of the victim's body. "It is well established that no legal standard exists to judge the prejudicial qualities of alleged improper comments by either party. Such must be scrutinized in light of the issues, parties, and general circumstances of the particular case." Carpenter v. State,404 So.2d 89, 97 (Ala.Cr.App. 1980), cert. denied, 404 So.2d 100
(Ala. 1981), and cases cited therein. See also Smith v. State,581 So.2d 497 (Ala.Cr.App. 1990) (prosecutorial comment that the defendant was one of the worst ever to enter the county was held to have been made in the heat of debate, was not an interjection of personal experience, and did not constitute plain error).
The appellant also alleges as error six comments made by the prosecutor during the penalty phase of the trial. Because no objections were made at trial to any of these comments, in order to constitute reversible error, the comments must rise to the level of plain error. Rule 45A, A.R.App.P.
The appellant alleges that the prosecutor improperly encouraged the jury to invoke the death sentence based on consideration of the impact of the crime on the victim's family, in violation of Booth v. Maryland, 482 U.S. 496,107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and South Carolina v.Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). However, this issue has been decided adversely to the appellant. See McWilliams v. State, [Ms. 6 Div. 190, August 23, 1991], 1991 WL 18448 (Ala.Cr.App. 1991), quoting Payne v.Tennessee, ___ U.S. ___, 111 S.Ct. 2597, 115 L.Ed.2d 720
(1991).
The appellant also argues that the prosecutor made the following improper comment to the jury during the penalty phase: "He [the appellant] asked you to spare his life, yet he never gave the victim in this case an opportunity to ask that her life be spared." However, this comment is a proper inference from the evidence. The appellant testified during the sentencing hearing before the jury. On cross-examination, *Page 573 
the prosecutor asked the appellant if he had allowed the victim to ask for her life and the appellant responded that he did not. On direct examination, the appellant asked the jury to spare his life. Prosecutors may properly comment on inferences from the evidence and may draw conclusions from the evidence based on their own reasoning. Holladay v. State, 549 So.2d 122
(Ala.Cr.App. 1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
The appellant objects to the underlined portion of the following remarks:
 "You know, we have heard some mention of Mr. Smith having had a spiritual conversion, and I hope he has. I certainly hope that is the case and you have heard some comments that he has shown remorse for what he did; that he has shown some regret for his part in this horrible act. And again, I hope that is true and I hope that he has and does have remorse for what he did. Ladies and gentlemen, that — those two things are all fine and well, and as I said, I hope they are both true. But that does not change the fact that he does owe a debt to society. The State of Alabama has the right to exact and demand the appropriate punishment against him."
The appellant argues that these comments precluded the jury from considering the mitigating evidence which he presented. However, the record shows that the trial court thoroughly instructed the jury on all statutory and nonstatutory mitigating circumstances, and instructed that a mitigating circumstance should be based on the evidence. This comment in no way restricted the jury's consideration of the mitigating circumstances presented or the alternative punishment of life without parole. These remarks simply were the prosecutor's legitimate inference from the evidence, were made in the heat of debate, and constituted nothing more than an acceptable appeal for law enforcement, which is permissible in closing argument. See Henderson v. State, supra.
The appellant contends that the prosecutor erred in making the following statement during the penalty phase, "I don't think I've heard anything, anything in this phase of the case that justifies what this individual did." The appellant argues that this comment improperly shifted the burden to the appellant to justify his crime. The record reveals that, during the penalty phase before the jury, the appellant presented the testimony of two family members and two witnesses who knew the appellant when he was in school, all of whom testified concerning the appellant's character. The appellant then testified in his own behalf, stating that he was very remorseful for what he had done. Thus, the prosecutor's comment concerning justification was a proper inference to be drawn from the evidence. Watson v. State, supra.
The appellant argues that the prosecutor improperly commented as follows:
 "His only motive in this case — it would be different, it might be slightly different if it was something other than money. But I think the aggravating circumstance in this case is even weightier and I think there are more aspects to it, more substance to it, due to the fact that he didn't even know, didn't even know the person whose life he was going to take."
The appellant argues that the prosecutor was improperly urging the jury to find a statutory aggravating circumstance, where no evidence concerning that circumstance had been introduced, citing Brooks v. Kemp, 762 F.2d 1383, 1408 (11th Cir. 1985), vacated on other grounds, 478 U.S. 1016, 106 S.Ct. 3325,92 L.Ed.2d 732 (1986). The record indicates that the State relied on the single statutory aggravating circumstance that the murder was committed for pecuniary gain. Both the prosecutor and the trial court informed the jury of this fact. The prosecutor's comment was merely that the single aggravating factor which was presented, that the murder was for pecuniary gain, was deserving of great weight, in light of the circumstances of the case. " '[W]hat is important at the selection stage [of the statutory aggravating circumstances] is an individualized determination on the basis of the character of the *Page 574 
individual and the circumstances of the crime.' (Emphasis in original.)" Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), affirmed, 577 So.2d 531 (Ala. 1991), quoting Zant v. Stephens,462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983). None of the comments cited by the appellant during the guilt or penalty phases of the trial rose to the level of plain error, pursuant to Rule 45A, A.R.App.P.
 IV
The appellant argues that the trial court's answer to a question by the jury during the sentencing phase misled the jury as to its role and violated the appellant's right to the reliable determination of sentence. The juror's question was: "Your Honor, if we sentence this man to death, then at your discretion, you can change it upon sentencing, is that correct?" The judge then responded, "Yes, sir." The juror asked, "If we sentence him to life without parole, can you still sentence him to death?" The judge responded, "Yes, sir." The appellant argues that this response led the jury to believe that the responsibility for determining the appropriateness of the appellant's death does not rest with the jury, in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633,86 L.Ed.2d 231 (1985). The trial court in no way implied that the jury's decision would be of no consequence or that it would have no influence on the verdict, as the appellant argues.
 "This argument was put to rest in Martin v. State, 548 So.2d [488] at 494 [Ala.Cr.App. 1988].
 " 'Under Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." However, the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentencing verdict was "advisory" and a "recommendation" and that the trial court would make the final decision as to sentence does not violate Caldwell. "[C]omments which accurately explain the respective functions of the Judge and jury are permissible under Caldwell 'as long as the significance of [the jury's] recommendation is adequately stressed.' " Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir. 1987). Here, neither the prosecutor nor the trial court misrepresented the effect of the jury's sentencing recommendation. The cases of Caldwell, supra; Mann v. Dugger, 817 F.2d 1471 (11th Cir.), vacated, 828 F.2d 1498 (1987); Adams v. Wainwright, 804 F.2d 1526 (11th Cir. 1986), modified, Adams v. Duggar, 816 F.2d 1493 (11th Cir. 1987), and Harich, supra, each involved a situation where the prosecutor and the trial court misled the jury as to its critical role in sentencing under state law. In Hooks v. State, 534 So.2d 329 (Ala.Cr.App. 1987), this Court reviewed the decisions of other jurisdictions which have confronted this issue and concluded: "the trial judge's and the prosecutor's remarks clearly define the jury's role in this sentencing scheme. Thus, the jury could not have been confused as to its responsibility in the sentencing process. The remarks made here were a correct statement of the law and did not tend to mislead or misinform the jury. Therefore, we conclude the remarks were not improper under Caldwell, supra." '
 "The present cause is indistinguishable from Martin. The challenged comments were not contrary to Caldwell v. Mississippi. See also Kuenzel, 577 So.2d at 501."
Smith v. State, 581 So.2d 497, 519-20 (Ala.Cr.App. 1990), reversed on other grounds, Ex parte Smith, 581 So.2d 531 (Ala. 1991).
Similarly, in the present case, the trial court in no way misled the jury as to its role in sentencing. The remarks made by the trial court correctly stated the law and in no way misinformed the jury. *Page 575 
 V
The appellant argues that the trial court erred by failing to instruct the jury on the lesser included offenses of reckless murder and reckless manslaughter. While it is clear that an accused in Alabama has a right to have the jury charged on any lesser included offense if, based on the evidence presented, there is a reasonable theory to support that charge, Beck v.Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), there was no reasonable theory, based on the evidence presented here, to support a charge on either of these lesser included offenses. The evidence clearly indicated that the criminal conduct was directed solely at the victim. Because reckless murder requires conduct creating a grave risk of death to human life in general or universal malice, the evidence did not support such a charge. See Northington v. State,413 So.2d 1169, 1170-72 (Ala.Cr.App. 1981), cert. quashed, 413 So.2d 1172
(Ala. 1982) ("the function of this section [§ 13A-6-2(a)(2), Ala. Code 1975] is to embrace those homicides caused by such acts as driving an automobile in a grossly wanton manner, shooting a firearm into a crowd or moving train, and throwing a timber from a roof onto a crowded street" Id. at 1172).
Moreover, the evidence did not support a charge on reckless manslaughter. The appellant argues that because his theory of the case was that he and his accomplice had intended only to hurt or frighten the victim and not to kill her, the jury could have believed that he had no intent to kill although he did in fact cause the victim's death by his conduct. However, the evidence clearly indicates that the appellant's conduct toward the victim was intentional. His confession states that he knew that the victim was to be murdered; there was evidence that, prior to the offense the appellant and his accomplice were looking for a gun with which to commit the offense; and the nature and circumstances of the offense further indicate that the offense was intentional. The only evidence introduced that tended to show that the appellant believed that the victim was only to be assaulted and frightened clearly related to the initial phases of the accomplices' planning. Furthermore, although not raised by the appellant, there was no evidence of intoxication to warrant a charge on reckless manslaughter.Barnett v. State, 540 So.2d 810 (Ala.Cr.App. 1988). Because the appellant's admitted actions were inconsistent with recklessness, no such charge was warranted under the evidence presented.
 VI
The appellant argues that the statement he made to police officers following his arrest violated his Fifth and Fourteenth Amendment rights and, therefore, should have been suppressed. Specifically, the appellant argues that he was misled into giving this statement, because the investigator informed him only that he was being questioned about the stolen videocassette recorder, rather than about the murder. A suppression hearing was held prior to trial, and the trial court held that the appellant's confession was admissible. The evidence showed that the victim was murdered in her home and that a Samsung videocassette recorder was taken from the victim's home at that time. Subsequently a search warrant was executed at the appellant's residence and a videocassette recorder, with serial numbers matching that of the videocassette recorder taken from the victim's residence was discovered. The appellant was then taken into custody and was advised of his rights, pursuant to Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), while sitting in a police car in front of his house. The appellant was told that he was being taken into custody and that he would be questioned about the stolen videocassette recorder. The officer testified that in his opinion the appellant was not intoxicated. The appellant was taken to the Colbert County Sheriff's Office, and his girlfriend was allowed to ride in the car with him. The appellant stated that he did not wish to invoke any of his rights, and he did not request an attorney. Upon arrival at the Colbert County courthouse, the appellant was taken to the investigator's office and *Page 576 
was again advised of his Miranda rights from a standard waiver form. Handwritten at the top of the form was "Elizabeth Dorlene Sennett Homicide." The appellant read and signed the form, waiving his rights and indicating that he wished to make a statement. He was informed that the questioning pertained to the videocassette recorder that was taken from the victim's house when she was killed. The investigator and another officer testified that no one threatened, intimidated, promised anything to, or coerced the appellant in order to get his statement.
The appellant contends that he was misled because he was informed that he was only being questioned concerning the stolen videocassette recorder. In Colorado v. Spring,479 U.S. 564, 575-77, 107 S.Ct. 851, 858-59, 93 L.Ed.2d 954 (1987), the defendant argued that an agent's failure to inform him that he would be questioned about the murder constituted official "trickery" sufficient to invalidate his waiver of his Fifth Amendment rights. The United States Supreme Court held:
 "This Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of Miranda rights, and we expressly decline so to hold today.
 "Once Miranda warnings are given, it is difficult to see how official silence could cause a suspect to misunderstand the nature of his constitutional right — 'his right to refuse to answer any question which might incriminate him.' United States v. Washington, 431 U.S. 181, 188
[97 S.Ct. 1814, 1819, 52 L.Ed.2d 238] (1977). 'Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled.' Ibid. We have held that a valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might . . . affec[t] his decision to confess.' Moran v. Burbine, 475 U.S. [412], 422 [106 S.Ct. 1135, 1141, 89 L.Ed.2d 410] [1986]. '[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.' Ibid. Here the additional information could affect only the wisdom of a Miranda waiver, not its essentially voluntary and knowing nature. Accordingly, the failure of the law enforcement official to inform [the defendant] of the subject matter of the interrogation could not affect [the defendant's] decision to waive his Fifth Amendment privilege in a constitutionally significant manner."
Colorado v. Spring, 479 U.S. at 576-77, 107 S.Ct. at 858-59.
Similarly, in the present case, the investigator's informing the appellant that he would be questioned concerning the stolen videocassette recorder, rather than concerning the murder, could only affect the "wisdom of a Miranda waiver" and not its "voluntary and knowing nature." Id. Moreover, a reasonable inference from the evidence presented through the investigator's testimony was that, prior to making his confession, the appellant was informed that the videocassette recorder in question had been taken from the victim's house during the murder. In Colorado v. Spring, supra, the United States Supreme Court noted that the trial court had made no finding of official trickery and had found:
 " 'Though it is true that [the agents] did not specifically advise [the defendant] that a part of their interrogation would include questions about the Colorado homicide, the questions themselves suggested the topic of inquiry.' . . . According to the Colorado Supreme Court, 'it is unclear whether [the defendant] was told by the agents that they wanted to question him specifically about the firearms violations for which he was arrested or whether the agents simply began questioning [the defendant] without making any statement concerning the subject matter of the interrogation. What is clear is that the agents did not tell [the defendant] that they were going to ask him questions about the killing of [the *Page 577 
victim] before [the defendant] made his original decision to waive his Miranda rights.' [People v. Spring] 713 P.2d [865,] 871 [Colo. 1985]."
Colorado v. Spring, supra, 479 U.S. at 575 n. 7, 107 S.Ct. at 858 n. 7. As in Colorado v. Spring, supra, the murder and the theft were part of the res gestae and the evidentiary facts relating to the two offenses were interwoven. We find no affirmative misrepresentation or trickery which would cause the appellant's statement to have been unknowing, unintelligent, or involuntary.
 VII
The appellant argues that the police did not have probable cause to believe that he had committed a crime and, therefore, that they could not constitutionally search his house or arrest him. Consequently, he argues, all of the physical evidence and the statements obtained as a result of the search or his arrest should have been suppressed as fruit of the poisonous tree. No challenge was made at trial to the search of the appellant's house or to his arrest; thus, there is no suggestion of illegality as to these matters in the record. Cf. Ex parteWatkins, 509 So.2d 1074, 1076-77 (Ala. 1987), cert. denied,484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987) (wherein the Court, addressing a claim made pursuant to Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which had been neither raised nor preserved in the record, wrote, "The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which the error is predicated ever occurred"); White v.State, 587 So.2d 1218 (Ala.Cr.App. 1990), affirmed,587 So.2d 1236 (Ala. 1991) (wherein this court held that an appellant could not raise a claim pursuant to Batson v. Kentucky, supra, where "[t]he record does not even raise the inference of unconstitutional jury selection").
Moreover, the search of the appellant's residence was made pursuant to a warrant and thus is to be presumed valid.
 "With regard to search warrants, the general rule is that the defendant has the burden of proof in challenging the validity of the execution or service of the search warrant. United States v. Marx, 635 F.2d 436, 441 (5th Cir. 1981). 'The warrant stands cloaked with the presumption of validity both in the court below and on this appeal. The appellant had the burden of proof in challenging the validity of its execution or service.' United States v. Vigo, 413 F.2d 691, 693
(5th Cir. 1969)."
Brownlee v. State, 535 So.2d 217 (Ala.Cr.App. 1988), reversed on other grounds, 535 So.2d 218 (Ala. 1988). See also Calhounv. State, 460 So.2d 268 (Ala.Cr.App. 1984).
As to the appellant's arrest, the police had probable cause for that arrest under the totality of the circumstances test set out in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317,76 L.Ed.2d 527 (1983), because the videocassette recorder found in the appellant's residence was determined to have been the videocassette recorder taken from the victim's home during the murder. See Williams v. State, 565 So.2d 1233 (Ala.Cr.App. 1990), (wherein one of the appellant's accomplices raised the issue of probable cause to arrest and this court, in the companion case, addressed the probable cause determination under the same factual background now raised).
We find no plain error in the admission of the physical evidence and the appellant's statement, because we do not find under this record that either the appellant's arrest or the search of his residence was illegal.
 VIII
The appellant argues that the trial court failed to adequately question the jurors as to potential prejudice resulting from exposure to a newspaper article about the trial. The record indicates that, after the lunch break on the third day of trial, the following transpired:
 "BY THE COURT: Let the record show we are outside the presence of the jury.
 "[DEFENSE COUNSEL]: It was pointed out to defense counsel, and I don't remember *Page 578 
by whom, but it was pointed out that one of the jurors in this particular trial walked into the courtroom this morning with a newspaper under his arm. And because of that report, I investigated and looked under the second jury chair in the first row and found a copy of The Birmingham News. And an article, I think, in one of the sections directly related to this case.
 "BY THE COURT: In Section E, page one of November 2nd, Birmingham Post Herald.
"[DEFENSE COUNSEL]: Excuse me, Post Herald.
"BY THE COURT: Anything from the State?
 "[PROSECUTOR]: Let me just say this — there is no indication . . . at the present time that anybody has actually read that article. And I would just request that the Court inquire as to whether or not anyone has violated his order with regard to not reading anything about this case. And I think what the Court said, and the record, I think, will bear me out, is that the Court directed the jurors not to read anything or watch anything or listen to anything with regard to this case. I don't think you put a general ban on them as far as reading the newspaper all together.
"[DEFENSE COUNSEL]: I think that's correct.
 "[PROSECUTOR]: And I think the matter can be resolved very simply by asking if anyone has read the newspaper about this case, and further admonishing them not to do so.
"BY THE COURT: Anything else?
 "[PROSECUTOR]: In fact, I would agree to this, if the Court wants to tell the jury not to bring any newspapers to the courthouse or into the courtroom, that would be fine with me. You know, that might just help us to avoid the possibility of someone seeing such an article.
"BY THE COURT: Anything else?
 "[DEFENSE COUNSEL]: I don't want to blow it out of proportion, but, you know, I sure would like to know whether that particular juror has read this article or not.
 "BY THE COURT: Well, I will ask them in general if anyone has read any article. I don't know that I want to pick someone out unless I get a response.
". . . .
 "[PROSECUTOR]: I think it ought to be a general question; I don't think you have to ostracize the man or —
 "[DEFENSE COUNSEL]: I realize I'm risking turning that man off, but still —
 "[PROSECUTOR]: Nobody has to know who the information came from.
 "[DEFENSE COUNSEL]: — Still in the interest of my client, I really have to find out whether he has been prejudiced by that particular article.
 "BY THE COURT: Well, if we get no response, that would be the end of the matter.
 "[PROSECUTOR]: Let's let the Judge ask the question.
"BY THE COURT: Bring the jury in, please.
"(At this time the jury returned to courtroom)
 "BY THE COURT: Ladies and gentlemen of the jury, during the trial of this case, I've instructed you not to do certain things, you know, such as I asked you to stay outside the courtroom and not to read anything about this case or listen to any news broadcasts. I would like to ask you if anyone on this jury has read any article in any newspaper about this case?
"(There was no response)
 "BY THE COURT: Okay, I would like to further instruct you not to bring newspapers into the courtroom and I would like to ask you not to read any newspaper until after the conclusion of this case. It is very important that you follow these instructions and what I've just told you and the ones I've given to you previously. I'll be glad to explain all that to you at the conclusion of the entire case."
Thus, the trial court questioned the jury as to whether any member had read an article pertaining to the trial and the juror response *Page 579 
indicated that no one had read such an article.
 "Jurors should not be permitted, while in the discharge of their duty, to read newspapers containing statements of fact pertaining to the trial. Leith v. State, 206 Ala. 439, 444, 90 So. 687 (1921). 'However, the fact that a juror has read a newspaper in which the case is discussed does not entitle the defendant to an automatic mistrial.' Wiggins v. State, 429 So.2d 666, 668
(Ala.Cr.App. 1983)."
Thomas v. State, 473 So.2d 627, 631 (Ala.Cr.App. 1985).
 " 'Even where the jurors receive newspaper accounts of, or comments on, the case, the verdict will not be disturbed if the papers contain nothing calculated to mislead or improperly affect their minds or to prejudice their verdict, or if the court is satisfied that none of the jurors were influenced thereby. The court is not required to discharge the jury or to reverse the verdict because of a newspaper article, which, it is satisfied, the jurors have neither seen nor heard. . . .' "23 A.C.J.S.Crim. Law § 1364 (1961)."
Wiggins v. State, 429 So.2d 666, 668 (Ala.Cr.App. 1983).
Because there has been no showing that any juror saw any prejudicial newspaper article, and because the defense counsel acquiesced in the trial court's instructions and raised no objection, we find no error in the trial court's instructions.
 IX
The appellant argues that the trial court erred in denying his motion to individually voir dire the jury panel. In the present case, the jury panel of 50 potential jurors were voir dired together. The appellant argues that he was prejudiced thereby because the case was highly publicized and because he was hampered from asking specific questions, which he argues were important to the selection of a jury in a capital offense. However, the record indicates that this cause had been transferred from Colbert County to Jefferson County, pursuant to a motion for change of venue. When the panel was questioned, no one on the jury panel indicated any knowledge of any of the facts of this case. See Kuenzel v. State, 577 So.2d 474
(Ala.Cr.App. 1990), affirmed, 577 So.2d 531 (Ala. 1991). Moreover, there is no indication in the record that the questioning was inhibited or confined in any manner. The fact that the appellant's case involved capital murder is not alone reason to require individual voir dire. See e.g. Kuenzel v.State, supra; Henderson v. State, supra; Hallford v. State,548 So.2d 526, 538-39 (Ala.Cr.App. 1988), affirmed, 548 So.2d 547
(Ala. 1989), cert. denied, 493 U.S. 945, 110 S.Ct. 354,107 L.Ed.2d 342 (1989). A trial court's decision in denying individual voir dire examination of a jury panel will not be disturbed on appeal absent an abuse of that discretion. Kuenzelv. State, supra; Henderson v. State, supra; Hallford v. State, supra, at 539. We find no abuse of discretion in this case.
 X
The appellant argues that the admission into evidence of photographs which were allegedly inflammatory, prejudicial, redundant, and without probative value, requires reversal in this case. The appellant refers to photographs of the crime scene, as well as photographs of the victim's body during autopsy.
 "Photographs are admissible into evidence within the discretion of the trial judge and will be reviewed on appeal only to determine if there has been an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973).
 "Photographs are admissible if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered. Baldwin v. State, 282 Ala. 653, 213 So.2d 819
(1968). The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Magwood v. State, 494 So.2d 124 (Ala.Cr.App. 1985), aff'd, Ex parte Magwood, 494 So.2d 154 (Ala. *Page 580 
1986), cert. denied, Magwood v. Alabama, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
 "Some of the photographs in issue here depicted wounds to the back and neck area of the deceased. The State argues that the photographs were credible evidence for the jury to view in order to determine whether a pocketknife or a larger knife that was found at the scene could have inflicted the depicted wounds. Based on the record, we agree.
". . . .
 "This court has held that a capital murder by multiple stab wounds is especially heinous, atrocious, or cruel. Dunkins v. State, 437 So.2d 1349 (Ala.Cr.App. 1982), aff'd, Ex parte Dunkins, 437 So.2d 1356 (Ala. 1983). As noted earlier, photographs depicting the character and location of wounds on a deceased's body are admissible even though they are cumulative and are based on undisputed matters. Magwood, 494 So.2d [124] 141 [Ala.Cr.App. 1985]. The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Id. Also a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury. Id."
Ex parte Bankhead, 585 So.2d 112 (Ala. 1991).
In the present case, during the cross-examination of the physician who treated the victim upon her arrival at the hospital, as well as during the cross-examination of the coroner, the appellant raised the question as to whether or not different knives were used to inflict the stab wounds. Apparently the appellant's purpose was to suggest that Charles Sennett had returned home after the appellant and Parker had left to find the victim still alive and that he had then killed her by stabbing her with another knife. Thus, the nature of the knife wounds became relevant. Moreover, during trial the State emphasized the fact that the appellant's statement was corroborated by these photographs as independent evidence. This court has viewed the copies of the photographs which are contained in the record and finds no error in their admission at trial.
 XI
The appellant argues that he was denied a fair trial because his first attorney negotiated and accepted a job with the Lauderdale County prosecutor's office while he was preparing the appellant's case for trial, without informing the appellant of this alleged conflict of interest. The record indicates that the appellant's first attorney immediately moved to withdraw as the appellant's counsel upon being offered and accepting a job with the Lauderdale County prosecutor's office. The motion was granted by the trial court, and new counsel was appointed to represent the appellant. The appellant's allegation of conflict of interest is based solely on the fact that during a period of time his first attorney was representing him while he was negotiating a job with the prosecutor's office in a contiguous county. The appellant refers to no specific actions by the attorney which prejudiced the appellant and, thus, he has failed to establish that an actual conflict of interest existed. See United States v. Mers, 701 F.2d 1321, 1328 (11th Cir. 1983), cert. denied, 464 U.S. 991, 104 S.Ct. 481,78 L.Ed.2d 679 (1983); Cuyler v. Sullivan, 446 U.S. 335, 348,100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980).
 "We will not find an actual conflict unless appellants point to 'specific instances in the record to suggest an actual conflict or impairment of their interest.' United States v. Fox, 613 F.2d [99] at 102 [5th Cir. 1980]. Appellants must make a factual showing of inconsistent interest and must demonstrate that the attorney 'made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remained hypothetical.' Comment, 68 J.Crim.L. and Criminology, supra, at 232 (parenthesis in original). There is no violation where the conflict is 'irrelevant or merely hypothetical'; there must be *Page 581 
an 'actual significant conflict.' Foxworth [v. Wainwright], 516 F.2d [1072] at 1077 n. 7 [5th Cir. 1975]."
United States v. Mers, supra, at 1328.
In Jackson v. State, 502 So.2d 858, 86668 (Ala.Cr.App. 1986), a court-appointed attorney withdrew from representing the defendant because he accepted a position as an assistant district attorney. The defendant, in that case, argued that because the attorney was subject to divided loyalties, an actual conflict of interest existed. This court noted that the attorney did not take part, in any manner, in the prosecution of the defendant's case after accepting the job as assistant district attorney. However, the cause was remanded to the trial court to conduct a hearing to determine whether an actual conflict existed. On return to remand, the trial court held that no actual conflict existed because the attorney brought no files or records pertaining to the defendant's case to the district attorney's office, did not consult with the district attorney concerning the defendant's case, did not reveal any information he had ascertained from the defendant to the district attorney's office, did not discuss the defendant's case with any attorney who actively prosecuted, or participated in any manner, in the defendant's trial, and did not obtain any exculpatory information while serving as defendant's attorney.
In the present case, the appellant's prior attorney did not join the district attorney's office in the county in which the appellant was being prosecuted; thus, he took no role in the appellant's prosecution. There is no indication that he spoke with, or in any way aided, any of the prosecutors from Colbert County. We find no actual conflict of interest in this case. See also Crawford v. State, 479 So.2d 1349, 1355 (Ala.Cr.App. 1985).
 XII
The appellant argues that the trial court erred in allowing the State to introduce testimony concerning hair fibers found at the scene, without proving the chain of custody for the fibers and without introducing the fibers into evidence. The record indicates that on the day of the offense Investigator Doug Hargett, of the Colbert County Sheriffs Department, took into custody an afghan that was partially covering the victim's body and a baseball-type cap that was found near the body. Investigator Hargett testified that both of these items remained in his possession or under his control until he delivered them to John Kilbourn at the Huntsville forensic laboratory. Kilbourn testified that he examined the afghan and the cap and removed some hairs from both of them. He compared these hairs to known samples of the appellant's hair, as well as to hair samples from John Parker, the appellant's accomplice. Kilbourn found hairs from the afghan and the cap to be consistent with the samples of the appellant's hair. Although Kilbourn testified concerning the results of his examination, there is no indication in the record as to the whereabouts of the hairs and the State did not offer them into evidence.
The appellant's allegations concerning a broken chain of custody refers to the custody of this evidence after Kilbourn's analysis. However, "the law is concerned with tracing the integrity of the substance only up through the completion of the analysis." Congo v. State, 409 So.2d 475, 479 (Ala.Cr.App. 1981), cert. denied, 412 So.2d 276 (Ala. 1982).
 "The purpose of establishing a chain of custody is to show a reasonable probability that there has been no tampering with the item of evidence. Williams v. State, Ala.Cr.App., 375 So.2d 1257, cert. denied, Ala., 375 So.2d 1271 (1979). Each link in the chain of custody here, from appellant through the [expert], was firmly established. The State presented 'ample assurance of the authority of the evidence,' Yarbrough v. State, Ala., 375 So.2d 1231 (1979), up to and including the time when the [evidence was] tested. That is all the law requires. See Taylor v. State, Ala.Cr.App., 372 So.2d 387 (1979)."
Id. See also Boggan v. State, 455 So.2d 228 (Ala.Cr.App. 1984) (wherein the prosecutor established sufficient chain of custody *Page 582 
of a shirt, which was allegedly worn by the defendant at the time of the crime, to warrant reception of testimony regarding results of chemical analysis of bloodstains found on the shirt). Moreover, there is no indication in the record that the appellant ever requested these hair samples or that he did not receive them, as a matter of discovery, or that he was denied access to them for the purpose of conducting an independent test, Moton v. State, 524 So.2d 381 (Ala.Cr.App. 1988). Furthermore, the appellant made no objection at trial to the expert's testimony or to the State's failure to produce or admit the hairs into evidence. There is no indication that the appellant suffered any prejudice because these hairs were not admitted into evidence.
 XIII
The appellant, who is white, argues that this cause must be remanded in order to supplement the record with regard to jury strikes. The record contains no indication of the racial composition of the venire or of the strikes made by either party. However, during the sentencing of the appellant by the trial judge, the judge stated that one black had served on the jury. The record further indicates that, prior to any questioning of the jury venire, and while making his motion for individual voir dire, the defense counsel stated that one of his reasons for requesting individual voir dire was to guard against any racial prejudice. However, after the jury was struck, no objection to the composition of the jury was made. During the motion for new trial by the appellant, defense counsel, who had not represented the appellant during trial, stated:
 "And finally, Judge, there are some cases that are being decided just about every day in the country concerning the Batson case, which you are familiar with, and which I think you had some exposure to last week; that Batson case would apply to white defendants. And it is my understanding that in this jury venire there were — was a great number of minorities, whether black or other minorities, and these were struck and no explanation was required of the State as to why these particular potential jurors were struck and it is our position that the Batson case would apply in the situation, and that there was only one black juror on this particular jury that was selected to hear this case."
The prosecutor, thereafter, responded to the defense counsel's claims and stated, in pertinent part:
 "The Batson case, if he is alleging that that amounts to incompetence of counsel, you know, the case that he makes reference to that says — and it's not even the law now that it applies as to white — defendants who are not members of a recognized minority group. But there is an indication that that's what the law is going to be. But at the time that this case was tried, even the first supreme court case relating to that subject had not been decided. So if they are alleging on that basis that counsel was inadequate, there was no way for the defense attorneys to have a crystal ball and know what the supreme court was going to decide, you know, three months later.
 "[DEFENSE COUNSEL]: Judge, I wasn't saying there was an inadequacy of counsel, the Batson thing. That was just an issue I brought up and it didn't have anything to do with defense counsel.
 "[PROSECUTOR]: Well, under the law at the time, there was no prima facie showing made and there was certainly no meaningful or purposeful discrimination on the part of the State in this case. There was no way for us to know what the law is going to be several months, several months afterwards."
The trial court subsequently denied the motion for new trial.
Thereafter, the appellant was appointed new counsel to represent him on appeal, and that counsel moved to supplement the record, requesting a number of items of evidence. He further filed a second motion to supplement the record. The trial court granted the appellant's motions and ordered, in pertinent part, that the clerk or court reporter include in the record "the strike list or other evidence showing the *Page 583 
names and race of each person who was present for jury service at the time of Mr. Smith's jury was selected [sic], as well as a list of those excused for cause and the strikes by the defendant and the State." The supplemental record includes a list of strikes indicating the jurors by number that were exercised by each party; however, the names and race of these potential jurors are not included.
Because defense counsel, during the motion for new trial, implied that a number of blacks were struck from the jury panel, without any refutation by the prosecutor, and because the trial court granted the appellant's motion to supplement the record as to the identity and the race of the jurors struck, we cannot say that there is no inference from the record to support a claim pursuant to Batson v. Kentucky, supra, and Powers v. Ohio, ___ U.S. ___, 111 S.Ct. 1364,113 L.Ed.2d 411 (1991). In Ex parte Watkins, 509 So.2d 1074,1076-77 (Ala. 1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269,98 L.Ed.2d 226 (1987) the Alabama Supreme Court held that a complaint made pursuant to Batson v. Kentucky, supra, could not constitute plain error, where the record did not support such an inference.
 "Although the record does show that the defendant is black and the victim was white, it does not show that the state exercised any of its peremptory challenges to remove prospective black jurors from the venire. The record as a whole simply does not raise an inference that the state was engaged in the practice of purposeful discrimination. Under the plain error rule this Court will 'notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner.' (Emphasis added.) Rule 39(k), supra. The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred (i.e., the state's use of its peremptory challenges to exclude blacks). In both [Ex parte] Jackson, [516 So.2d 768 (Ala. 1986)], and [Ex parte] Godbolt, [546 So.2d 991
(Ala. 1987),] the records were sufficient to show that prima facie cases of purposeful discrimination could be made by the defendants; therefore, those cases were remanded for determinations on the issue under guidelines set out in Batson."
Similarly, this court has found that where there was no indication in the record of any purposeful discrimination by the prosecutor in exercising peremptory challenges, plain error cannot be found. Kuenzel v. State, supra. In Kuenzel, this court further distinguished Ex parte Jackson, 516 So.2d 768
(Ala. 1986), and Ex parte Godbolt, 546 So.2d 991 (Ala. 1987), on the grounds that, in both cases, "the issue of systematic exclusion of blacks based on racial grounds was raised in the trial court. Here the issue was never raised before the trial court in any manner. On the record before this Court, we find no merit to the defendant's argument." Kuenzel, supra, at 486.
In the present case, this matter was raised before the trial court and the trial court took certain actions to resolve the matter. Because the record was never correctly supplemented, this cause is remanded to the trial court with instructions to make findings of fact regarding the racial composition of the jury venire, as well as the race of the veniremembers struck by the prosecution. The trial court shall determine whether a prima facie case of racial discrimination existed, pursuant toBatson v. Kentucky, supra. If it did, the trial court is instructed to require the State to come forward with race-neutral reasons for its strikes of those potential black jurors. Thereafter, the trial court shall determine whether the reasons given by the State are sufficiently race neutral pursuant to the guidelines set forth in Ex Parte Branch,526 So.2d 609 (Ala. 1987).
 XIV
In the present case, the trial court failed to enter specific written findings of *Page 584 
fact and conclusions of law as to the aggravating and mitigating circumstances, as required by § 13A-5-47(d), Code ofAlabama 1975. Although the appellant argues that such an omission requires a reversal, this court has consistently remanded cases in which the court failed to enter written findings of fact summarizing the crime and the defendant's participation in it. See Richardson v. State, 376 So.2d 205,224 (Ala.Cr.App. 1978), affirmed, 376 So.2d 228 (Ala. 1979), cert. denied, 460 U.S. 1017, 103 S.Ct. 1262, 75 L.Ed.2d 488
(1983); Murry v. State, 562 So.2d 1348, 1358, (Ala.Cr.App. 1988), Duren v. State, 507 So.2d 111, 12021 (Ala.Cr.App. 1986), affirmed, 507 So.2d 121 (Ala.), cert. denied, 484 U.S. 905,108 S.Ct. 249, 98 L.Ed.2d 206 (1987). Cf. Ex parte Henderson,584 So.2d 862 (Ala. 1991) (wherein the Alabama Supreme Court remanded a death case to this court, where this court failed to follow the statutory mandate of § 13A-5-53, Code of Alabama
1975). The trial court's oral sentencing of the appellant states that "[t]he Court has considered the circumstances in this case and finds that the aggravating circumstances enumerated herein to be present and outweigh the mitigating circumstances offered by the defendant." " 'Without knowing what the trial judge did, [this Court will be] unable to properly review his sentencing decision.' [Ex parte] Cochran,500 So.2d 1179 (Ala. 1985)." Murry v. State, supra, at 1359. Therefore, this cause is due to be remanded to the trial court with order that it enter written findings of fact and conclusions of law as to the aggravating and mitigating circumstances in this case.
REMANDED WITH INSTRUCTIONS.
All Judges concur. *Page 846