STATE OF NORTH CAROLINA v. TERESA RENEE BULLOCK

No. 469PA88

(Filed 7 February 1990)

**Homicide § 30 (NCI3d) — first degree murder — premeditation and deliberation — submission of second degree murder not required**
     The evidence in a first degree murder case overwhelmingly supported the elements of premeditation and deliberation and did not require the trial court to instruct the jury on

STATE v. BULLOCK

[326 N.C. 253 (1990)]

the lesser included offense of second degree murder where it tended to show that defendant stated "Let's get mama" before going downstairs to initiate the fight which led to defendant suffocating her mother with a pillow; the fight was initiated by defendant when deceased was lying asleep on the couch; defendant planned to kill her mother two weeks prior to this occasion but "chickened out"; defendant placed different medications in her mother's beer and water in preparing to kill her; defendant specially prepared the pillow by wrapping it in plastic bags for the purpose of suffocating her mother; defendant killed her mother for money in that she knew her mother intended to remove her as the payee on her disability checks, and she called her grandmother to see if there were any insurance policies on the life of her mother; lethal blows were inflicted by defendant after the victim had been rendered helpless; and the victim suffered great psychological stress from "air hunger" and died a brutal death. The prior unsworn statement by a co-conspirator which was subsequently repudiated by her under oath at trial that the victim held a knife against defendant was insufficient to require an instruction on second degree murder.

**Am Jur 2d, Homicide § 530.**

APPEAL by defendant pursuant to writ of certiorari from judgments sentencing defendant to life imprisonment for her conviction of murder in the first degree and a term of ten years for her conviction of conspiracy, entered by *Phillips, J.*, at the 1 December 1986 session of Superior Court, NEW HANOVER County. Heard in the Supreme Court 15 November 1989.

*Lacy H. Thornburg, Attorney General, by J. Michael Carpenter, Special Deputy Attorney General, and Debra Graves, Associate Attorney General, for the state.*

*H. Kenneth Stephens for defendant-appellant.*

MARTIN, Justice.

Defendant, Teresa Renee Bullock, age 19, was convicted of murder in the first degree of her mother, Annie Mae Bullock, and felonious conspiracy to commit murder. We find defendant's assignment of error to be without merit and conclude that her trial and sentencing were free of prejudicial error.

STATE v. BULLOCK

[326 N.C. 253 (1990)]

The state's evidence tended to show the following:

Early in the morning on 27 April 1986, officers of the Wilmington Police Department responded to a telephone call from defendant stating that she had found her mother dead in an upstairs closet of her apartment. Upon arrival, the police discovered the badly decomposing body of Annie Mae Bullock, age 36. The body was transferred that same day to Chapel Hill where Assistant Chief Medical Examiner Dr. James Michael Sullivan performed an autopsy. The autopsy revealed that the cause of death was suffocation.

Living in the apartment at 1027 Eighth Street, Wilmington, North Carolina, were: Annie Mae Bullock and two of her children, Teresa and Geneva, age 17; a cousin, Fontella Whitaker, age 19; and a friend, Sabrina Wallace, age 19. Teresa's two-year-old child, Geneva's two-month-old infant and Sabrina's one-year-old baby were also residing in the apartment.

On 3 May 1986, Fontella Whitaker went to the police station and informed the police that Teresa Bullock had murdered her mother on 25 April 1986. Fontella admitted her involvement in the case and turned state's witness. Geneva Bullock and Sabrina Wallace also agreed to testify for the state against defendant in return for lesser charges being filed against them. In the next two days, defendant was arrested and indicted for murder in the first degree and conspiracy.

At trial, Geneva Bullock recalled that on the morning of 25 April 1986 defendant woke her up saying "Let's get mama." They went downstairs and found Ms. Bullock lying on the couch with her face to the wall. She was listening to the stereo. Defendant deliberately turned the stereo off and the television on. Ms. Bullock said she wanted to listen to the stereo and cut the television off. This happened several times and Ms. Bullock finally said, "If that's going to make you feel any better, you can leave it on." Defendant replied, "No, it won't make me feel any better until you fight me like you wanted to fight me last night." Finally Ms. Bullock sat back down because "she really didn't want to argue with Teresa." Defendant then called Geneva, Fontella and Sabrina into the kitchen and asked them to help her hit her mother in the head with a Pepsi-Cola bottle. All three of the girls refused because they were afraid. Defendant asserted, "I'm not scared, I'll hit her in the head with the bottle." Defendant returned to the room where

her mother was resting, renewed the argument and hit her mother in the head with the bottle. The victim yelled, "That's enough, I'm going to call the cops. You're going to jail now." As she turned to go to the telephone, she tripped over the coffee table and fell. Defendant immediately sat on her chest to hold her down and began choking her with her hands. At some point, the victim called out to Sabrina that "if you'll help me, I'll give you a hundred dollars." Defendant asked her sister to hand her the pillow which she had specially prepared by wrapping it in plastic bags and placed on the stairs. Geneva did so and defendant held it over her mother's face for "more than ten minutes." The victim struggled for approximately three to five minutes. Defendant then announced, "Mama's dead." At some point, defendant made the other girls touch the pillow so that they would all be involved in the murder. Sabrina and Fontella assisted Teresa in carrying the body upstairs where it was placed into the hall closet and covered with sheets and clothes.

Approximately two weeks prior to the murder, Geneva recalled going to the bank with defendant to withdraw money from her account. Upon finding that the account was empty, defendant said, "I'm going to get her." Geneva testified that on that very night defendant had a pillow and said she was going to use it to get her mother. Apparently, defendant "chickened out and said she couldn't do it."

At some point prior to her death, the victim, Annie Mae Bullock, had been diagnosed as suffering from a paranoid schizophrenic disorder and had been involuntarily committed for psychiatric treatment an undetermined number of times. As a result, she was unable to perform her job duties at Textilease and began receiving social security benefits. Because of her particular disability, it was determined that Annie Mae Bullock was incapable of handling her own business affairs. Therefore, Teresa Bullock, the oldest child living in the same household, was named as payee. On 22 April 1986, three days before her death, Annie Mae Bullock went to the local Social Security office and spoke with Wayne Lloyd, a claims representative. According to Mr. Lloyd, Ms. Bullock suspected her oldest daughter of spending the checks and wished to change her named payee. Mr. Lloyd called Teresa to inform her of her mother's wishes and to ask her the whereabouts of a retroactive disability check in the amount of $5,395.00. When defendant stated that she still held the check, Mr. Lloyd asked her to return it to him as soon as possible. The check was not returned.

Fontella Whitaker testified that one or two nights before Annie Mae Bullock's death, defendant had attempted to suffocate her mother but decided against it when she realized her face was turned to the wall. Sabrina Wallace also gave evidence of several occasions upon which defendant had obtained various types of pills to put into her mother's beer or water for the purpose of putting her to sleep. On the evening before the murder, "[s]he was upstairs in her — well, she already had it mixed and she was shaking the bottle."

Defendant did not testify and presented no evidence.

The jury found defendant guilty of first-degree murder and conspiracy. At the conclusion of the penalty phase of the trial, the jury unanimously recommended that defendant be sentenced to life imprisonment on the murder conviction. Accordingly, the trial judge sentenced defendant to life imprisonment on the first-degree murder conviction and imposed a ten year sentence on the conspiracy conviction. Defendant's writ of certiorari was allowed 9 February 1989.

Defendant's sole assignment of error on appeal is that the trial court erroneously failed to instruct the jury on the lesser included offense of murder in the second degree. We hold that it did not err.

Murder in the first degree is the unlawful killing of a human being with malice and premeditation and deliberation. *State v. Judge*, 308 N.C. 658, 303 S.E.2d 817 (1983). Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation. *State v. Myers*, 299 N.C. 671, 263 S.E.2d 768 (1980). Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation. *State v. Hamlet*, 312 N.C. 162, 321 S.E.2d 837 (1984).

The trial court charged the jury that it was its duty to return a verdict of guilty of murder in the first degree based on premeditation and deliberation or a verdict of not guilty. No instruction was given on the lesser included offense of murder in the second degree. Defendant claims there was evidence that the victim was

"armed and provoked the fatal altercation" and that, as a result, her intent to kill was "formed under the provocation of the quarrel or struggle itself . . . " and, therefore, the jury should have been given the option of finding defendant guilty of second-degree murder. This Court has held that an instruction on murder in the second degree is required only when there is evidence to sustain such a verdict. *State v. Strickland*, 307 N.C. 274, 298 S.E.2d 645 (1983). One of the purposes of this rule is to eliminate compromise verdicts. Absent evidence supporting a verdict of the lesser offense, the trial court is not required to submit such a charge.

The state argues that all the evidence, direct and circumstantial, clearly supports the elements of premeditation and deliberation. In *State v. Jackson*, 317 N.C. 1, 343 S.E.2d 814 (1986), *judgment vacated*, 479 U.S. 1077, 94 L. Ed. 2d 133 (1987), we set forth several circumstances to be considered in determining whether a killing was done with premeditation and deliberation. Among them are: (1) want of provocation on the part of the deceased; (2) the conduct and statements of defendant before and after the killing; (3) threats and declarations of defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner. 317 N.C. at 23, 343 S.E.2d at 827.

Our review of the record in light of the principles established in *Jackson* clearly reveals overwhelming evidence to support premeditation and deliberation and an absence of evidence to support murder in the second degree. There is no evidence of provocation by the deceased — all three eyewitnesses testified that the fight was initiated by defendant when deceased was lying asleep on the couch. During the trial, Geneva Bullock recanted her previous statement made to the police that her mother had a knife and was holding it against her sister. There is evidence that defendant stated "Let's get mama" before going downstairs to initiate the fight which led to defendant suffocating her mother with a pillow. There is evidence that defendant planned to kill her mother two weeks prior to this occasion but "chickened out." There is evidence that defendant placed different medications in her mother's beer and water in preparing to kill her. There is evidence that defendant specially prepared the pillow by wrapping it in plastic bags for the purpose of suffocating her mother. As for motive, there is

evidence that defendant killed her mother for money: she knew her mother intended to remove her as the payee on her disability checks, she offered to split the disability check in the amount of $5,395.00 with her sister, Geneva, after the death of her mother, and she called her grandmother to see if there were any insurance policies on the life of her mother. The ill-will and previous difficulty between defendant and the victim is clearly illustrated by the above. There is evidence that lethal blows were inflicted by defendant after the victim had been rendered helpless. The pathologist testified that the victim suffered great psychological stress from "air hunger" and died a brutal death. As we have stated previously on similar facts:

> The record before us discloses a brutal and senseless murder committed without justification or excuse. There is evidence of preparation. . . . As with any victim of strangulation, death came slowly. To suggest that the murderer did not act with premeditation and deliberation, on the evidence presented, if believed, is to invite total disregard of the facts.

*State v. Strickland*, 307 N.C. at 293, 298 S.E.2d at 658.

Based on the overwhelming evidence supporting premeditation and deliberation, the trial court correctly instructed the jury to return a verdict of murder in the first degree or not guilty. The prior unsworn statement by a co-conspirator which is subsequently repudiated by her under oath at trial is insufficient grounds to require an instruction on murder in the second degree.

In defendant's trial we find

No error.