STATE OF NORTH CAROLINA v. RODNEY LEE MONTGOMERY

No. 265A90

(Filed 25 June 1992)

1. **Homicide § 253 (NCI4th) — first degree murder — premeditation and deliberation — sufficiency of evidence**

The State's evidence was sufficient to support a jury verdict finding defendant guilty of first degree murder on the theory that he killed the victim with premeditation and deliberation where it tended to show that about one hour before the victim's body was found, defendant was in the parking lot next to the apartment in which the murder was committed; the victim did not know defendant and defendant had never been inside the apartment before the day of the murder; the victim cleaned her eyeglasses on a regular basis and had cleaned them on the day she was murdered; a fingerprint lifted from a lens of the victim's glasses found in the apartment matched one of defendant's fingerprints; pubic hairs consistent with those of defendant were found in front of and on the sofa in the apartment; a butcher knife with human blood and fibers consistent with fibers taken from the sweatshirt the victim was wearing at the time of her death was found in a location between the victim's apartment and the house where defendant was residing at the time of the murder; the victim had nine different stab wounds and four cutting wounds; two wounds were inflicted on the victim's back, which permitted an inference that the victim was helpless or had been felled when the murderer inflicted some of the wounds; no evidence of provocation was presented; the murderer and the victim initially had contact in the living room based upon the physical evidence presented; and the fact that the victim's body was found in the bedroom suggests premeditation on the part of the murderer.

**Am Jur 2d, Homicide §§ 52, 439, 454.**

**Presumption of deliberation or premeditation from circumstances surrounding the killing. 96 ALR2d 1435.**

2. **Homicide §§ 266, 281 (NCI4th)— felony murder—underlying felonies of armed robbery and attempted rape—sufficiency of evidence**

The State's evidence was sufficient to support a jury verdict finding defendant guilty of first degree murder under the theory that defendant killed the victim while engaged in the underlying felony of armed robbery where it tended to show that the pocketbook of one of the victim's roommates had been rifled through at about the time of the murder and the money it had contained had been stolen. The evidence was also sufficient for the jury to find defendant guilty based on the underlying felony of attempted rape where it tended to show that the victim was found with her sweatpants inside out and without panties on; the victim's roommates testified that the victim was wearing underwear earlier that evening and was generally meticulous about her appearance; the couch on which the victim had been sitting when her roommates left was in disarray after the murder; and five pubic hairs consistent with those of the defendant were found on the couch, which tended to show that defendant had removed his pants while in the apartment.

**Am Jur 2d, Homicide §§ 71-75, 454.**

3. **Rape and Allied Offenses § 18.2 (NCI3d)— attempted rape— sufficiency of evidence**

The State's evidence was sufficient to support a jury verdict finding defendant guilty of attempted first degree rape where it tended to show that the victim did not know defendant and defendant had never been in the victim's apartment; the body of the victim, who had been repeatedly stabbed, was found in a bedroom of the apartment; when the victim's roommates left on the evening of the murder, the victim dressed in sweatpants was sitting on the sofa reading the newspaper with her eyeglasses on; when the victim's body was found, her sweatpants were inside out and she was not wearing panties; there were bruises and abrasions on her knees in addition to the stab wounds to her body; the sectional sofa on which the victim had been sitting was pulled apart and the coffee table in front of the sofa had been moved; the victim's panties were wadded up on the couch; the victim's eyeglasses were smeared with fingerprints, one of which was defendant's; the

police found pubic hairs consistent with those of defendant in front of and on the couch; an expert testified that because of the condition of the hairs, it was likely that the pubic region of the person who left them was exposed directly to the couch; and several hairs had flesh at the end, indicating a forceful removal.

**Am Jur 2d, Rape §§ 25, 26, 53, 54.**

4. **Burglary and Unlawful Breakings § 61 (NCI4th) — first degree burglary — sufficiency of evidence**

The evidence was sufficient to support defendant's conviction of first degree burglary where it tended to show that defendant was not an acquaintance of the victim or any of her roommates; when the victim's roommates left on the evening the victim was found murdered in their apartment, they closed the front door; the couch in the living room was in disarray after the murder, suggesting that the victim was surprised by defendant when he entered the apartment between 10:30 p.m. and 11:00 p.m.; and defendant stole money from a pocketbook after he entered the apartment, thus permitting the inference that he had the intent to commit larceny at the time he entered the apartment as alleged in the indictment.

**Am Jur 2d, Burglary §§ 29, 47.**

5. **Robbery § 2.2 (NCI3d) — armed robbery — ownership of property — conjunctive in indictment — no fatal variance**

There was no fatal variance between the indictment, the proof and the instructions in an armed robbery case where the indictment charged that defendant took money from the person and presence of the victim, the court instructed the jury that the State must prove that defendant took property from the person of the victim or took property of another in the victim's presence, and the evidence showed only that money was taken from the victim's presence, since the use of a conjunctive in the indictment does not require the State to prove various alternative matters alleged.

**Am Jur 2d, Indictments and Informations §§ 96, 214.**

STATE v. MONTGOMERY

[331 N.C. 559 (1992)]

**6. Robbery § 4.3 (NCI3d)— armed robbery—sufficiency of evidence**

The State's evidence was sufficient for the jury in a prosecution for robbery with a dangerous weapon where it tended to show that the victim possessed or had custody of a purse and its contents belonging to her roommate; money was stolen from the purse that was found in the bedroom where the victim was stabbed; and the victim was threatened or endangered by the knife used to stab her when the robbery occurred.

**Am Jur 2d, Robbery §§ 5, 51, 62.**

**7. Appeal and Error § 531 (NCI4th)— new trial—two votes for one basis—three votes for different basis**

A defendant convicted of first degree murder is awarded a new trial where two members of the Supreme Court support the result of a new trial solely on the basis that the trial court's instruction on reasonable doubt was unconstitutional and three members support that result solely on the basis that a potential juror was improperly excused by the prosecutor because of his national origin.

**Am Jur 2d, Appeal and Error § 963.**

Justice FRYE concurring in result.

Chief Justice EXUM and Justice WHICHARD join in this concurring opinion.

Justice MEYER dissenting.

Justice LAKE joins in this dissenting opinion.

APPEAL as of right pursuant to N.C.G.S. § 7A-27 from a judgment imposing a sentence of death upon the defendant for his conviction of first-degree murder, entered by *Downs, J.*, in the Superior Court, MECKLENBURG County, on 13 June 1990. The defendant's motion to bypass the Court of Appeals on his appeals from additional judgments for first-degree burglary, robbery with a dangerous weapon, and attempted first-degree rape was allowed by the Supreme Court, and those appeals were consolidated with the defendant's appeal of the murder conviction. Heard in the Supreme Court on 10 March 1992.

*Lacy H. Thornburg, Attorney General, by Joan Herre Byers, Special Deputy Attorney General, and Valerie B. Spalding, Assistant Attorney General, for the State.*

*Kenneth J. Rose for the defendant-appellant.*

MITCHELL, Justice.

The defendant was convicted of first-degree murder, robbery with a dangerous weapon, first-degree burglary, and attempted first-degree rape. The jury recommended a sentence of death for the conviction of first-degree murder. The defendant raised thirty-six assignments of error on appeal. We do not reach all these assignments of error because, for the reasons stated below, we grant the defendant a new trial.

Some of the State's evidence at trial tended to show the following. On Saturday, 21 January 1989, Kimberly Piccolo, a student at the University of North Carolina at Charlotte, and her roommates invited several friends to their apartment near the university campus for dinner. After dinner, Piccolo's roommates and their friends went to a party held at an adjoining apartment complex. Piccolo declined their invitation to attend. When Piccolo's roommates left, Piccolo was wearing a maroon sweatshirt, sweatpants, and socks and was sitting on the couch with her eyeglasses on reading the newspaper. Piccolo was unable to see well without her glasses. Piccolo was alone in the apartment when her friends left.

That same evening around 10:00 p.m., Christy Webb, a neighbor of Piccolo, drove up to her apartment with her boyfriend, Steve Aumer. As Webb was walking away from her car, she was stopped by a man who was wearing a green army jacket to which an identification badge was attached. The man asked Webb for change for a twenty-dollar bill. Webb stated that she did not have any change. The man then asked if she had any change upstairs in her apartment. At that point Aumer got out of the car, looked the man in the eye, and stated that Webb did not have any change. Aumer testified at trial that the defendant was the man he saw in the parking lot that evening.

At 11:00 p.m., Piccolo's roommates returned to the apartment. Upon entering, they noticed that the contents of a purse had been spilled on the floor. They went upstairs and found Piccolo's body

STATE v. MONTGOMERY

[331 N.C. 559 (1992)]

on the bathroom floor. She had been stabbed many times. They immediately called the police. When Piccolo's body was found, she was dressed in a sweatshirt, sweatpants which were inside out, and socks, but she was not wearing panties.

An autopsy showed that Piccolo had received nine stab wounds that were clustered in her chest, arm, back, and abdomen and several defensive wounds on her hands. One stab wound went completely through her right hand. The cause of death was loss of blood.

The couch on which Piccolo had been sitting when her roommates had left her had been pushed apart. The panties Piccolo had been wearing earlier that evening were found on the couch. A butcher knife was missing from the kitchen. Piccolo's eyeglasses were found on the coffee table. A fingerprint was lifted from one of the lenses; this print matched a print of the defendant's left ring finger. Five pubic hairs were found on the couch; these hairs were consistent with those of the defendant. The police later found the missing butcher knife in a parking lot located between Piccolo's apartment and the house owned by the defendant's sister where the defendant was staying at the time of the murder. Blood and fibers consistent with fibers from Piccolo's sweatshirt were on the knife. The defendant's brother owned a green army jacket to which a University of North Carolina identification badge was attached.

The defendant at trial presented alibi evidence. Several of the defendant's relatives testified that he was with them the entire evening of 21 January 1989.

Other evidence introduced at trial is discussed at other points in this opinion where pertinent to the issues raised by the defendant.

The defendant assigns as error the trial court's denial of his motion to dismiss the first-degree murder charge for insufficiency of the evidence. The defendant contends that the State presented insufficient evidence to support a finding that he killed the victim with premeditation and deliberation or that he killed her while he was engaged in one of the underlying felonies of first-degree burglary, robbery with a dangerous weapon, or attempted first-degree rape.

In *State v. Small*, 328 N.C. 175, 400 S.E.2d 413 (1991), we described the appropriate standard of review as follows:

STATE v. MONTGOMERY

[331 N.C. 559 (1992)]

"On a motion to dismiss on the ground of insufficiency of the evidence, the question for the court is whether there is substantial evidence of each element of the crime charged and of the defendant's perpetration of such crime." *State v. Bates*, 309 N.C. 528, 533, 308 S.E.2d 258, 262 (1983).

[T]he trial court must view the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from it. . . . If there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied.

*State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 382-83 (1988) (citations omitted). Further, "[t]he defendant's evidence, unless favorable to the State, is not to be taken into consideration." *State v. Jones*, 280 N.C. 60, 66, 184 S.E.2d 862, 866 (1971). The determination of the witnesses' credibility is for the jury. *See Locklear*, 322 N.C. at 358, 368 S.E.2d at 383. "[C]ontradictions and discrepancies do not warrant dismissal of the case—they are for the jury to resolve." *State v. Earnhardt*, 307 N.C. 62, 67, 296 S.E.2d 649, 653 (1982).

*State v. Small*, 328 N.C. at 180-81, 400 S.E.2d at 415-16, *quoted in State v. Quick*, 329 N.C. 1, 19, 405 S.E.2d 179, 190-91 (1991). " 'The trial court's function is to determine whether the evidence will permit *a reasonable inference* that the defendant is guilty of the crimes charged.' " *Quick*, 329 N.C. at 19, 405 S.E.2d at --- (quoting *State v. Vause*, 328 N.C. 231, 237, 400 S.E.2d 57, 61 (1991) ).

[1] Under this standard, there was substantial evidence to support findings that the defendant killed the victim with premeditation and deliberation and that he killed her during the course of one of the underlying felonies. The State's evidence tended to show that a fingerprint lifted from a lens of the victim's eyeglasses found in the apartment matched one of the defendant's fingerprints. The victim did not know the defendant and the defendant had never been inside the apartment before the day of the murder. The victim cleaned her glasses on a regular basis and had cleaned them on the day she was murdered. About one hour before the victim's body was found, the defendant was in the parking lot next to the apartment in which the murder was committed. The

police found pubic hairs consistent with those of the defendant in front of and on the sofa in the apartment. A butcher knife with human blood and fibers consistent with the fibers taken from the sweatshirt the victim was wearing at the time of her death was found in a location between the victim's apartment and the house where the defendant was residing at the time of the murder.

When determining whether there is sufficient evidence that a killing was done with premeditation and deliberation, the court may consider, *inter alia,* evidence tending to show the following: (1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) the dealing of lethal blows after the deceased has been felled and rendered helpless; (4) evidence that the killing was done in a brutal manner; and (5) the nature and number of the victim's wounds. *See State v. Vause,* 328 N.C. 231, 238, 400 S.E.2d 57, 62 (1991); *State v. Bullock,* 326 N.C. 253, 258, 388 S.E.2d 81, 84 (1990).

The State presented evidence of the brutal manner in which the victim was killed. The victim had nine different stab wounds and four cutting wounds on her arms. The repeated stabbing showed the brutality of the murder. Two wounds were inflicted on the victim's back, which permitted an inference that the victim was helpless or had been felled when the murderer inflicted some of the wounds. No evidence of provocation was presented. *State v. Robbins,* 319 N.C. 465, 356 S.E.2d 279, *cert. denied,* 484 U.S. 918, 98 L. Ed. 2d 226 (1987). The murderer and the victim initially had contact in the living room based upon the physical evidence presented. The victim's body was found in the bedroom. The movement of the victim from the living room to the bedroom suggests premeditation on the part of the murderer. *State v. Jackson,* 317 N.C. 1, 343 S.E.2d 814 (1986), *vacated on other grounds,* 479 U.S. 1077, 94 L. Ed. 2d 133 (1987).

[2] Substantial evidence was introduced from which the jury could find the defendant guilty under the felony-murder theory with robbery as the underlying felony. The pocketbook of Denise Robbins, one of the victim's roommates, had been rifled through at about the time of the murder, and the money it had contained had been stolen. The evidence also tended to show that the victim was murdered during an attempted rape. The victim was found with her sweatpants inside out and without panties on. The victim's roommates testified that the victim was wearing underwear earlier

that evening and was generally meticulous about her appearance. The couch on which she had been sitting when her roommates left was in disarray after the murder. Five pubic hairs consistent with those of the defendant were found on the couch, which tended to show that the defendant had removed his pants while in the apartment.

The defendant argues that the evidence in the present case was no stronger than that in other cases where the court dismissed first-degree murder charges. Specifically, the defendant relies upon *State v. Reese*, 319 N.C. 110, 353 S.E.2d 352 (1987), and *State v. Cutler*, 271 N.C. 379, 156 S.E.2d 679 (1967). In *Reese* and *Cutler*, however, there was no physical evidence tying the defendants to the actual murder scenes. In the present case, the defendant's fingerprints were found in the victim's apartment. The defendant was also identified as being in the apartment complex at approximately the time of the murder. Pubic hairs consistent with those of the defendant were found in the apartment. We conclude that *Reese* and *Cutler* are distinguishable from the present case. Here, the evidence was sufficient to survive the defendant's motion to dismiss the charge of first-degree murder both on the theory of premeditation and deliberation and on the felony-murder theory.

[3] The defendant next assigns as error the trial court's denial of his motion to dismiss the charge of attempted first-degree rape for insufficiency of the evidence. We disagree and conclude that the evidence was sufficient for submission of that charge to the jury. In order to prove attempted first-degree rape, the State must prove that the defendant had the intent to commit the crime and committed an act which went beyond mere preparation, but fell short of actual commission of the first-degree rape. *State v. Boone*, 307 N.C. 198, 297 S.E.2d 585 (1982). The evidence presented by the State tended to show that the victim did not know the defendant and the defendant had never been in the victim's apartment. When the victim's roommates left on the evening of the murder, the victim dressed in sweatpants was sitting on the sofa reading the newspaper with her eyeglasses on. When the victim's body was found, her sweatpants were inside out and she was not wearing panties. There were bruises and abrasions on her knees in addition to the stab wounds to her body. The sectional sofa on which the victim had been sitting earlier in the evening was pulled apart and the coffee table in front of the sofa had been moved. The victim's panties were wadded up on the couch. The victim's

eyeglasses were smeared with fingerprints, one of which was the defendant's. The police found pubic hairs consistent with those of the defendant in front of and on the couch. An expert testified that because of the condition of the hairs, it was likely that the pubic region of the person who left them was exposed directly to the couch. Also, several of the hairs had flesh at the end, indicating a forceful removal.

Such evidence would support a finding by a reasonable juror that the defendant surprised the victim. A struggle occurred during which the defendant removed the victim's sweatpants and panties and raped or attempted to rape her. The defendant took the victim upstairs where he stabbed her numerous times and replaced her sweatpants inside out. Such substantial evidence in the present case formed a sufficient basis from which a reasonable jury could infer that the defendant committed attempted first-degree rape. *See generally State v. Harris*, 319 N.C. 383, 354 S.E.2d 222 (1987); *State v. McDougall*, 308 N.C. 1, 12, 301 S.E.2d 308, 315-16, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983).

[4] The defendant next assigns as error the trial court's denial of his motion to dismiss the charge of first-degree burglary for insufficiency of the evidence. First-degree burglary is the breaking or entering of an occupied dwelling at night with intent to commit a felony therein. *State v. Noland*, 312 N.C. 1, 13, 320 S.E.2d 642, 650 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985); N.C.G.S. § 14-51 (1986). Substantial evidence presented by the State tended to show that the defendant broke into or entered the apartment while it was occupied by the victim between 10:30 p.m. and 11:00 p.m. The evidence tended to show that the defendant was not an acquaintance of the victim or any of her roommates. When the victim's roommates left on the evening of the murder, they closed the front door of the apartment. The couch in the living room was in disarray after the murder, suggesting that the victim was surprised by the defendant when he entered the apartment.

The criminal intent of the defendant at the time he entered the apartment could be inferred from the acts he committed after he entered. *State v. Williams*, 330 N.C. 579, 585, 411 S.E.2d 814, 818 (1992). The indictment against the defendant alleged he had the intent to commit larceny at the time of the breaking or entering. The State's evidence tending to show that the defendant stole money from a pocketbook after he entered the apartment was

substantial evidence that he had the intent to commit larceny when he entered the apartment. The trial court did not err in denying the defendant's motion to dismiss the first-degree burglary charge.

[5] The defendant next assigns two errors with respect to the charge of robbery with a dangerous weapon. The defendant argues that the trial court's instructions to the jury varied from the indictment. The trial court instructed the jury that the State must prove that "the defendant took the property from the person of Ms. Piccolo or took property of another in the presence of Ms. Piccolo." The indictment stated in pertinent part that "Rodney Lee Montgomery did unlawfully, willfully and feloniously steal, take, and carry away another's personal property, United States currency of the value of approximately $160.00, from the person and presence of Kimberly Ann Piccolo. . . ." The defendant argues that the State presented no evidence that the money was taken from the person of Ms. Piccolo; it only presented evidence tending to show that the money was taken from her presence.

The use of a conjunctive in the indictment does not require the State to prove various alternative matters alleged. *State v. Williams*, 314 N.C. 337, 355, 333 S.E.2d 708, 721 (1985). We conclude, therefore, that there was no fatal variance between the indictment, the proof presented at trial, and the trial court's instructions to the jury.

[6] The defendant also contends that the evidence was insufficient to support the submission of the charge of robbery with a dangerous weapon to the jury. Robbery with a dangerous weapon is the taking of personal property from the person or presence of another, by use or threatened use of a dangerous weapon, whereby the victim's life is endangered or threatened. *State v. Rasor*, 319 N.C. 577, 356 S.E.2d 328 (1987); N.C.G.S. § 14-87(a) (1986). There was substantial evidence that the victim possessed or had custody of the purse and its contents. The evidence also tended to show that $180.00 was stolen from the purse that was found in the bedroom where the victim was stabbed. The victim was threatened or endangered by the knife used to stab her when the robbery occurred. We, therefore, conclude that the evidence was sufficient to require submission of the charge of robbery with a dangerous weapon to the jury.

[7] The defendant next assigns as error the trial court's instruction to the jury defining the term "reasonable doubt." The defendant contends in this regard that the instruction given in this case

was nearly identical to the instruction found unconstitutional in *Cage v. Louisiana*, 498 U.S. ---, 112 L. Ed. 2d 339 (1990) *(per curiam)*.

The defendant requested by written motion that the trial court use the pattern jury instruction on reasonable doubt in its charge to the jury. The trial court has the duty to define the term "reasonable doubt" when requested to give such an instruction to the jury. *State v. Shaw*, 284 N.C. 366, 200 S.E.2d 585 (1973). Trial courts are not required to use an exact formula when instructing on reasonable doubt. *State v. Watson*, 294 N.C. 159, 167, 240 S.E.2d 440, 446 (1978). Where the trial court undertakes to define the term "reasonable doubt," however, its instruction must be a correct statement of the law. *State v. Wells*, 290 N.C. 485, 226 S.E.2d 325 (1976).

The State contends that the defendant did not object to the instruction and, therefore, that this assignment is not properly before us for appellate review. We conclude, however, that the defendant properly preserved the issue raised in this assignment for appellate review.

The defendant submitted a written request to the trial court to give the reasonable doubt instruction contained in the pattern jury instructions. N.C.P.I.—Crim. 101.10 (1974). Understandably, the trial court instead gave an instruction taken directly from *State v. Williams*, 308 N.C. 47, 63, 301 S.E.2d 335, 345-46, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), a case decided seven years before *Cage* and in which the question decided in *Cage* was not before us. The defendant's written request for a particular instruction on reasonable doubt met the requirements of Appellate Rule 10(b)(2) and constituted a sufficient objection to the different instruction actually given to preserve this issue for appellate review. *State v. Smith*, 311 N.C. 287, 290, 316 S.E.2d 73, 75 (1984); *see also State v. Pakulski*, 319 N.C. 562, 575, 356 S.E.2d 319, 327 (1987) (applying the "spirit" of Appellate Rule 10(b)(2) ).

In the present case, the trial court failed to give the defendant's requested instruction on reasonable doubt and instructed the jury in the following manner:

> Members of the jury, a reasonable doubt, or at least a defini-
> tion of that [sic] is acceptable by our Supreme Court, is that
> it is not a vain, imaginary or fanciful doubt, but rather it
> is one based upon sanity or saneness and rationality. And

**STATE v. MONTGOMERY**

[331 N.C. 559 (1992)]

when it is said that the jury must be satisfied of the defend-ant's guilt beyond a reasonable doubt, it means that you must be fully satisfied or entirely convinced or satisfied to a *moral certainty* of the truth of the charge, and after considering and comparing and weighing all the evidence, or the lack of that evidence, as the case may be, if your minds are left in such condition that you cannot say that you have abiding faith to a *moral certainty* of the defendant's guilt of one or more or all of those charges, then under those circumstances, you have a reasonable doubt. Otherwise, you do not.

A reasonable doubt, as that term is employed in the ad-ministration of criminal law, is an *honest, substantial misgiv-ing*, one generated by the insufficiency which fails to convince your judgment and conscience and satisfy your reason as to the guilt of the accused.

A reasonable doubt is not a doubt suggested by the in-genuity of counsel, or by your own ingenuity not legitimately warranted by the testimony or the lack thereof; nor is it one born of a merciful inclination or disposition to permit a defend-ant to escape the penalty of the law; nor is it one prompted by sympathy for him or anyone connected with him.

(Emphasis added.)

Five months after the trial of this defendant, the Supreme Court of the United States held in *Cage* that the following instruction violated the Due Process Clause of the Fourteenth Amendment:

If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a prob-ability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty*, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt*. It is a doubt that a reasonable man

can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty*.

498 U.S. at ---, 112 L. Ed. 2d at 341-42 (emphasis placed by the Court). The Supreme Court reviewed the instruction given in *Cage* as a whole and focused on the combination of terms used there in holding the instruction unconstitutional. The Court stated:

> The charge did at one point instruct that to convict, guilt must be found beyond a reasonable doubt; but it then equated a reasonable doubt with a "grave uncertainty" and an "actual substantial doubt," and stated that what was required was a "moral certainty" that the defendant was guilty. It is plain to us that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When these statements are then considered with the reference to "moral certainty," rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.

*Id.* at ---, 112 L. Ed. 2d at 342.

Relying on *Cage*, the defendant contends that the instruction given by the trial court in the present case was contrary to the requirement of proof "beyond a reasonable doubt" embodied in the Due Process Clause. *In re Winship*, 397 U.S. 358, 25 L. Ed. 2d 368 (1970). We addressed this same issue recently in *State v. Hudson*, 331 N.C. 122, 415 S.E.2d 732 (1992). In that case, the defendant also argued that the trial court's instruction on reasonable doubt violated *Cage*. The trial court in its instruction in *Hudson* used the term "substantial misgiving," but did not equate reasonable doubt with a "moral certainty." *Id.* at 141, 415 S.E.2d at 742. Because the trial court in *Hudson* did not use the combination of terms condemned in *Cage* and, thus, could not have misled the jury, we concluded that the instruction there was not error. *Id.* at 142-43, 415 S.E.2d at 742-43. However, in the case at bar, the use of the terms "substantial misgiving" and "moral certainty" in combination in the trial court's reasonable doubt instruction violated the requirements of the Due Process Clause as interpreted by the Supreme Court in *Cage*.

STATE v. MONTGOMERY

[331 N.C. 559 (1992)]

The trial court in the present case in instructing on reasonable doubt used a combination of terms that was nearly identical to the combination condemned in *Cage*. The trial court equated reasonable doubt with a "substantial misgiving" which, while not identical to the "substantial doubt" or "grave uncertainty" language condemned in *Cage*, conveyed a nearly identical meaning. More importantly, the trial court in the present case joined its definition of a reasonable doubt as an "honest, substantial misgiving" with a requirement that to convict the jury must be convinced to a "moral certainty," rather than to evidentiary certainty. The trial court stated the "moral certainty" test two separate times in the instruction. While the instruction given here was not identical to the instruction held unconstitutional in *Cage*, the trial court used a combination of terms so similar to the combination disapproved in *Cage* that there is a "reasonable likelihood" that the jury applied the challenged instruction in a way that violated the Due Process Clause. *See Estelle v. McGuire*, 502 U.S. ---, ---, n.4, 116 L. Ed. 2d 385, 399 n.4 (1991) (disapproving the language describing the standard of review set forth in *Cage* and *Yates v. Evatt*, 500 U.S. ---, 114 L. Ed. 2d 432 (1991), in terms of how reasonable jurors could or would have understood the trial court's instructions, and reasserting the standard of review set forth in *Boyde v. California*, 494 U.S. 370, 380, 108 L. Ed. 2d 316, 329 (1990) ("[W]hether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violated the Constitution)). Our opinion in *State v. Williams*, 308 N.C. 47, 301 S.E.2d 335, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), supports no different conclusion, as this question was not before us in that case.

Having determined that the trial court's instruction gave rise to error under the Constitution of the United States, we next must determine whether the State has met its burden of showing that the error was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1988). The evidence presented by the State tending to show the defendant's guilt, while strong, was circumstantial. The defendant's evidence tended to show an alibi. There was neither a confession by the defendant nor a witness to the murder. Based on this evidence, we conclude that the State has failed to show that the constitutional error in this case was harmless beyond a reasonable doubt. Therefore, under the binding authority of the *Cage* decision, this Court is required to hold that the defendant is entitled to a new trial on the charges against him.

STATE v. MONTGOMERY

[331 N.C. 559 (1992)]

New trial.

Justice FRYE concurring in result.

I agree with Justice Mitchell's opinion insofar as it holds that the evidence was sufficient to support the verdicts. I also agree that defendant must have a new trial, although I do so for an entirely different reason: the exclusion of a potential juror because of his national origin in violation of Article I, Section 26 of the North Carolina Constitution.

While questioning potential jurors, the prosecutor discovered that venireperson Benson Sesay, a black junior high school science teacher, was originally from Africa. The prosecutor subsequently excused Mr. Sesay as a juror in defendant's trial. Pursuant to *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986), defendant's attorney requested that the prosecutor state for the record his grounds for excusing Mr. Sesay. The prosecutor stated:

> Two grounds, Your Honor. First is the potential juror was a teacher, and we as a team will look to strike teachers unless we can find a reason to keep them. We have kept one teacher. We found reason to keep her, Ms. Beasley, because she is about the same age as the victim, she went to UNCC, and we feel that she will associate with the victim. The fact that Mr. Sesay is a teacher is a reason for us to strike him unless we can find a reason to keep him. The fact that he is not from this country is also another reason. I have had experiences where, because of the upbringings in other countries, people are influenced in the way they look at the law in this country. For these two reasons, the State exercises a challenge.

Defendant's attorney then objected to Mr. Sesay's excusal "under these circumstances." The trial court denied the objection.

Defendant argues on appeal that the excusal of Mr. Sesay violated the Equal Protection Clause of the Fourteenth Amendment, *see Batson*, 476 U.S. 79, 90 L. Ed. 2d 69, and Article I, Section 26 of the North Carolina Constitution. I agree with defendant that Mr. Sesay's excusal violated our State Constitution.[1]

---

1. Defendant also argues that the excusal of another venireperson, Adabishi Amusan, violated the United States and North Carolina Constitutions for the same reason as the excusal of Mr. Sesay. Mr. Amusan, originally from Nigeria, was excused by the prosecutor because of his ambivalence toward the death penalty

STATE v. MONTGOMERY

[331 N.C. 559 (1992)]

Because I decide this case on state constitutional grounds, I do not express an opinion as to whether Mr. Sesay's excusal from jury service in this case also violated the United States Constitution.

Article I, Section 26 states that "[n]o person shall be excluded from jury service on account of sex, race, color, religion, or national origin." In *State v. Cofield*, 320 N.C. 297, 357 S.E.2d 622 (1987), a case involving racial discrimination in the selection of a grand jury foreman, we explained in detail the purposes served by Article I, Section 26. Writing for the Court, Chief Justice Exum said:

> Article I, section 26 does more than protect individuals from unequal treatment. The people of North Carolina have declared in this provision that they will not tolerate the corruption of their juries by racism, sexism and similar forms of irrational prejudice. They have recognized that the judicial system of a democratic society must operate evenhandedly if it is to command the respect and support of those subject to its jurisdiction. It must also be *perceived* to operate evenhandedly . . . .
>
> . . . .
>
> . . . The effect of racial discrimination on the outcome of the proceedings is immaterial. Our state constitutional guarantees against racial discrimination in jury service are intended to protect values other than the reliability of the outcome of the proceedings. Central to these protections, as we have already noted, is the perception of evenhandedness in the administration of justice. Article I, section 26 in particular is intended to protect the integrity of the judicial system, not just the reliability of the conviction obtained in a particular case. The question, therefore, is not whether discrimination in the foreman selection process affected the outcome of the grand jury proceedings; rather, the question is whether there was racial discrimination in the selection of this officer at all.

*Id.* at 302-04, 357 S.E.2d at 625-26 (footnote omitted). Similarly, the question in this case is not whether discrimination in the jury selection process affected the outcome of defendant's trial; rather,

---

and because he "came from Nigeria, and not being familiar—possibly imposing his laws and customs of that country in this country and in this trial." Because I conclude that the excusal of Mr. Sesay violated our State Constitution, it is not necessary to consider the excusal of Mr. Amusan.

the question is whether there was discrimination on the basis of national origin in the excusal of a potential juror.

The prosecutor stated for the record that one of the reasons he was excusing Mr. Sesay was "the fact that he is not from this country." He explained that it was his experience that "because of their upbringings in other countries, people are influenced in the way they look at the law in this country." Certainly, a potential juror can be excused from jury service if he or she is unable to understand and follow the law as explained by the trial court. See N.C.G.S. § 9-15(a) (1986) (prospective jurors may be asked questions to determine their "fitness and competency . . . to serve as a juror"). In this case, however, there was no evidence that Mr. Sesay, because of his African heritage or for any other reason, would be unable to understand and follow the law of this state and country. A review of the record indicates that Mr. Sesay was not asked in which African country he was born, how long he had lived in that African country, how long he had lived in the United States, or whether his "upbringing" in that other country would influence the way he looked at the law in this country. To the contrary, in response to questioning from the prosecutor, Mr. Sesay said he could follow the law of North Carolina as it related to the death penalty. Based on the record, the prosecutor's suggestion that Mr. Sesay's upbringing would influence his understanding of North Carolina law was completely without foundation. To allow Mr. Sesay's removal on the facts of this case would mean that any person born in another country could be prevented from serving on any jury in this state, regardless of his or her understanding of our judicial system.

The fact that the prosecutor gave two reasons for excusing Mr. Sesay, one of which was facially nondiscriminatory, does not change the result in this case. As noted above, Article I, Section 26 is intended "to protect the integrity of the judicial system, not just the reliability of the conviction obtained in a particular case." Cofield, 320 N.C. at 304, 357 S.E.2d at 626. Accordingly, it is imperative that the judicial system "also be perceived to operate evenhandedly." Id. at 302, 357 S.E.2d at 625. To allow an ostensibly valid reason for excusing a potential juror to "cancel out" a patently discriminatory and unconstitutional reason would render Article I, Section 26 an empty vessel. At the very least, in this case, the prosecutor's facially nondiscriminatory reason does not eliminate the perception that a potential juror was not allowed

to serve because he "is not from this country." As we said in *Cofield*, "[e]xclusion of a racial group from jury service ... entangles the courts in a web of prejudice and stigmatization." *Id.* at 303, 357 S.E.2d at 625; *see also id.* at 310, 357 S.E.2d at 630 (Mitchell, J., concurring in result) ("[T]he intent of the people of North Carolina [in enacting Article I, Section 26] was to guarantee *absolutely unto themselves* that in *all* cases *their* system of justice would be free of both the reality and the appearance of racism, sexism and other forms of discrimination in these twilight years of the Twentieth Century.").

Finally, the fact that defendant is American does not prevent him from objecting to the exclusion of Mr. Sesay on the basis of Mr. Sesay's national origin. In *State v. Moore*, 329 N.C. 245, 404 S.E.2d 845 (1991), we held that a black defendant had standing to object to the removal of a white grand jury foreman. "The issue," we said, "is whether he was selected in a racially discriminatory manner. We conclude that defendant had standing to raise this issue . . . ." *Id.* at 247-48, 404 S.E.2d at 847 (footnote omitted); *cf. Powers v. Ohio*, 499 U.S. ---, 113 L. Ed. 2d 411 (1991) (Supreme Court, interpreting Fourteenth Amendment, held that a white defendant had standing to object to the removal of a black venireperson).

Having found error under Article I, Section 26 of the North Carolina Constitution, it is unnecessary to engage in harmless error analysis. *Moore*, 329 N.C. at 248, 404 S.E.2d at 848 ("[V]iolations of article I, section 26 involve more than the reliability of the result of the proceedings. The integrity of the judicial system is at issue, and a harmless error analysis under these circumstances is inapposite."). Defendant must therefore receive a new trial.

For these reasons, and not those stated in Justice Mitchell's opinion, I vote to remand this case for a new trial.

Chief Justice EXUM and Justice WHICHARD join in this concurring opinion.

Justice MEYER dissenting.

I dissent from the result reached by the plurality regarding the instruction on reasonable doubt tendered by the trial court in the instant case. It is a fundamental tenet of our procedural law that a party must object to an allegedly improper jury instruc-

tion if the party is to preserve the objection for appellate review. Appellate Rule 10(b)(2) states this in explicit terms: "A party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objection . . . ." N.C. R. App. P. 10(b)(2). Here, as noted in the main opinion, it is apparent that defense counsel made a written request to the court that the pattern jury instruction on reasonable doubt be used. Nowhere in the record does there appear any indication that the court denied this request. However, at the charge conference, the following colloquy occurred:

> THE COURT: . . . . Now, as to reasonable doubt, I will give a definition of reasonable doubt from *State vs. Williams* in 308 North Carolina Reporter. There are two *Williams* cases, but I will be glad to show it to you if you'll approach the bench.

> (Conference at the Bench)

> THE COURT: Anything else, gentlemen, as far as the precharge conference or requested instructions?

> MR. WOLFE: Nothing from the State, Your Honor.

> MR. HOWERTON: No, sir.

As is apparent from the above discussion, defense counsel related that he had no objection to the court's announced intention to use the *Williams* instruction, rather than the pattern jury instruction. Therefore, defendant's assignment of error in this regard should be deemed waived, and a "plain error" analysis should prevail.

Attempting to reconcile this glaring reality, the main opinion argues that somehow defendant here complied with Rule 10(b)(2) and does so on the basis of our opinions in *State v. Smith*, 311 N.C. 287, 290, 316 S.E.2d 73, 75 (1984), and *State v. Pakulski*, 319 N.C. 562, 575, 356 S.E.2d 319, 327 (1987). *Smith* is clearly not apposite because *Smith* dealt with a failure to object, whereas here, we have an affirmative waiver by an announcement that defendant had no objection to the use of the *Williams* instruction. *Pakulski* is similarly inapposite. In *Pakulski*, the defendants argued that the trial court erred in failing to give a requested instruction on prior inconsistent statements of a witness. During the instruction conference, defense counsel asked the court to give the pattern jury instruction on prior inconsistent statements. The trial judge

STATE v. MONTGOMERY

[331 N.C. 559 (1992)]

then stated, "If I overlook that, call it to my attention. I don't think I will." *Id.* at 574, 356 S.E.2d at 327. Nevertheless, the court failed to provide the requested instruction; apparently, no objection was thereafter made by the defendant. *Id.* at 574-75, 356 S.E.2d at 327. The instant case presents a far different factual background. Here, as noted above, after announcing its intent to provide the *Williams* reasonable doubt instruction the trial court expressly asked counsel whether they took issue with the *Williams* instruction. This inquiry was answered in the negative by defense counsel. Under the circumstances, defendant's failure to object when presented with an opportunity to do so amounted to a waiver of this potential assignment of error. Therefore, defendant's argument should be addressed in terms of "plain error" analysis.

In deciding whether an assignment of error amounts to "plain error," we have traditionally employed an exacting standard.

"[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is '*fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done,' or 'where [the error] is grave error which amounts to a denial of a fundamental right of the accused,' or the error has ' "resulted in a miscarriage of justice or in the denial to appellant of a fair trial" ' or where the error is such as to 'seriously affect the fairness, integrity or public reputation of judicial proceedings' or where it can be fairly said 'the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.' "

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982) (footnotes omitted)). Before deciding that an error by the trial court amounts to "plain error," the reviewing court must be convinced that absent the error, the jury probably would have reached a different verdict. *State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986). "In other words, the appellate court must determine that the error in question 'tilted the scales' and caused the jury to convict the defendant." *Id.* (citing *State v. Black*, 308 N.C. 736, 741, 303 S.E.2d 804, 807 (1983)). In the case *sub judice*, a review of the whole record reveals that the reasonable doubt instruction did not amount to plain error. As noted in the main opinion, there was "substantial evidence to support findings that the defendant

STATE v. MONTGOMERY

[331 N.C. 559 (1992)]

killed the victim with premeditation and deliberation and that he killed her during the course of one of the underlying felonies." The existence of defendant's fingerprint on the victim's glasses, defendant's presence in the parking lot shortly before the murder, the presence in the victim's apartment of pubic hairs consistent with that of defendant, and the location of the murder weapon near the defendant's residence made any error in the court's instruction pale in significance. In the face of this overwhelming evidence, so characterized and exhaustively set out in the main opinion, defendant is unable to show that the instruction had a "probable impact" on the jury's verdict.

Moreover, assuming *arguendo* that defendant did not waive his objection in this regard, *Cage* does not dictate that we find reversible error in the instant case. In *Cage*, the Supreme Court found error in the Louisiana trial court's reasonable doubt instruction, stating:

> The charge did at one point instruct that to convict, guilt must be found beyond a reasonable doubt; but it then equated a reasonable doubt with a "grave uncertainty" and an "actual substantial doubt," and stated that what was required was a "moral certainty" that the defendant was guilty. It is plain to us that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When those statements are then considered with the reference to "moral certainty," rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.

*Cage v. Louisiana*, --- U.S. ---, ---, 112 L. Ed. 2d 339, 342 (1990).

Only recently, in *State v. Hudson*, 331 N.C. 122, 415 S.E.2d 732 (1992), we had occasion to interpret the Court's holding in *Cage*. In *Hudson*, we stated that *Cage* was to be read narrowly and emphasized that the *Cage* Court condemned a *combination* of three terms: "grave uncertainty," "actual substantial doubt," and "moral certainty." *Id.* at 142, 415 S.E.2d at 742. Therefore, because none of the terms condemned in *Cage* appeared in the *Hudson* instruction, we upheld the trial court's instruction. *Id.* at 142-43, 415 S.E.2d at 742-43.

Notwithstanding our position in *Hudson*, the main opinion to-day finds unconstitutional the *Williams* reasonable doubt instruction, an instruction that contains only *one* of the phrases found objectionable by the Court in *Cage* ("moral certainty"). Disavowing our express intent to give *Cage* a "narrow reading," the main opinion relates: "While the instruction given here was not identical to the instruction held unconstitutional in *Cage*, the trial court used a combination of terms so similar to the combination disapproved in *Cage* that there is a 'reasonable likelihood' that the jury applied the challenged instruction in a way that violated the Due Process Clause." In reading *Cage* broadly, the main opinion deviates from the clear dictate of our own prior case law as well as from that of virtually every other appellate court in the land that has considered the matter. *See Gaskins v. McKellar*, --- U.S. ---, 114 L. Ed. 2d 728 (Stevens, J., concurring in denial of writ of certiorari and acknowledging that *Cage* is to be read narrowly and emphasizing the critical import of the "grave uncertainty" language), *reh'g denied*, --- U.S. ---, 115 L. Ed. 2d 1098 (1991); *see also Ex parte White*, 587 So. 2d 1236 (Ala. 1991) (finding permissible an instruction that failed to equate reasonable doubt with "grave uncertainty" and "actual substantial doubt" and that did not require jury to find guilt to a "moral certainty"), *cert. denied*, --- U.S. ---, 117 L. Ed. 2d 142, *reh'g denied*, --- U.S. ---, 117 L. Ed. 2d 665 (1992); *Smith v. State*, 588 So. 2d 561 (Ala. Crim. App. 1991) (finding no error in use of terms "actual and substantial doubt" and "moral certainty"); *Adams v. State*, 587 So. 2d 1265 (Ala. Crim. App. 1991) (finding permissible use of terms "actual and substantial doubt" and "moral certainty"); *Fells v. State*, 587 So. 2d 1061 (Ala. Crim. App. 1991) (finding use of term "moral certainty" to be proper); *People v. Jennings*, 53 Cal. 3d 334, 807 P.2d 1009, 279 Cal. Rptr. 780 (same), *cert. denied*, --- U.S. ---, 116 L. Ed. 2d 462 (1991); *Bradford v. State*, 261 Ga. 833, 412 S.E.2d 534 (1992) (instruction permissible when court used only "moral and reasonable certainty"); *Potts v. State*, 261 Ga. 716, 410 S.E.2d 89 (1991) (instruction permissible when court did not equate reasonable doubt with "grave uncertainty" or "actual substantial doubt"), *cert. denied*, 120 L. Ed. 2d 908 (1992); *State v. Rhoades*, 121 Idaho 63, 822 P.2d 960, 977 (1991) (Johnson, J., concurring) (instruction permissible with "actual doubt"), *petition for cert. filed*, --- U.S. ---, --- L. Ed. 2d --- (No. 91-8010, filed 20 April 1992); *Commonwealth v. Beldotti*, 409 Mass. 553, 567 N.E.2d 1219 (1991) (instruction permissible with "moral certain-

STATE v. MONTGOMERY

[331 N.C. 559 (1992)]

ty" language); *State v. Barnard*, 820 S.W.2d 674 (Mo. Ct. App. 1991) (instruction permissible where no *Cage* language used); *State v. Morley*, 239 Neb. 141, 474 N.W.2d 660 (1991) (instruction permissible when "moral uncertainty" and "actual and substantial doubt" used); *Lee v. State*, 107 Nev. 507, 813 P.2d 1010 (1991) (instruction permissible with "actual and substantial doubt" language); *Lord v. State*, 107 Nev. 28, 806 P.2d 548 (1991) (same); *State v. Gonzalez*, 822 P.2d 1214 (Utah App. 1991) (instruction proper when contains none of the language condemned in *Cage*).

Furthermore, and more specifically, I disagree with the main opinion's assertion that the instruction here involved a "combination of terms that was nearly identical to the combination condemned in *Cage*" and that it was therefore improper. First, the majority concludes that the instruction here was improper because the term used here, "substantial misgiving," is "nearly identical" to the "substantial doubt" and "grave uncertainty" language condemned in *Cage*. Second, according to the main opinion, the trial court improperly joined its definition of reasonable doubt as an "actual substantial misgiving" with a requirement that to convict, the jury must be convinced to a "moral certainty."

As a threshold matter, the phrase, "honest, substantial misgiving," in itself, is not improper in a reasonable doubt instruction. This much we concluded in *Hudson*, 331 N.C. at 142-43, 415 S.E.2d at 742-43. The main opinion here, however, exhibits its skillful hand at semantic sleight-of-hand and concludes that the phrase "honest, substantial misgiving" is the equivalent of the "substantial doubt" and "grave uncertainty" language condemned in *Cage*. This conclusion is contrary to *Hudson* and can only be considered specious. Thus, the majority's holding, at bottom, is that the use in a reasonable doubt instruction of the term "moral certainty" alone violates due process. This view is plainly contrary to our view that *Cage* is to be read narrowly, and given that there exists in the challenged instruction only one of the phrases condemned in *Cage*, it is highly unlikely that there is a "reasonable likelihood" that the jury applied the instruction in a manner violative of the Due Process Clause. Moreover, the main opinion's holding is contrary to the well-settled principle that a definition of reasonable doubt does not require exactitude. *See State v. Watson*, 294 N.C. 159, 167, 240 S.E.2d 440, 446 (1978).

As I read the opinions filed in this case, four votes do not exist to overrule *Williams* or to condemn its reasonable doubt instruction. Two members of the Court support the result of a new trial solely on the basis of a *Cage* violation, and three members solely on the basis of a *Cofield* violation. The majority vote in this case thus supports only the result reached in the main opinion and not its reasoning. The language in *Williams* that is condemned in the main opinion seems to have been preferred over the language of the pattern instructions by a number of our trial judges and, consequently, has been used frequently. We have no way of knowing how many hundreds of cases in which the trial judge employed the *Williams* language are in the appeal pipeline. Given the lack of any precedential value of the main opinion, it will have no effect on those cases.

In sum, I believe that the main opinion errs in its conclusion that the reasonable doubt instruction tendered by the trial court was unconstitutional.

I do not join the concurring-in-result opinion of Justice Frye, as I perceive no *Cofield* error in this case.

I respectfully dissent.

Justice LAKE joins in this dissenting opinion.