BROWN, Judge.
The appellant, Irene Elizabeth Ferrera, was convicted of intentional murder, a violation of § 13A-6-2, Code of Alabama 1975. She was sentenced to life imprisonment.
The appellant’s sole contention on appeal is that the trial court erred in refusing to charge the jury on manslaughter as a lesser-included offense of murder. Manslaughter is defined in § 13A-6-3, Code of Alabama 1975, as follows:
“(a) A person commits the crime of manslaughter if:
“(1) He recklessly causes the death of another person, or
“(2) He causes the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he causes the death due *508 to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself.”
The term “recklessly” is defined, in pertinent part, in § 13A-2-2(3), as follows:
“A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.”
The state presented evidence tending to show the following. In the late hours of June 7, 1995, the bloody, nude body of the victim, Kenneth Lee Kindred, was found lying in the living room of his home. An autopsy revealed that Kindred had suffered approximately 15 blunt-force injuries to his head, and that he had also been stabbed in his chest and in his abdomen. The stab wound to Kindred’s chest had pierced his heart. Kindred did not have any defensive injuries on his hands. Kindred died as a result of multiple blunt- and sharp-force injuries.
Blood found on the ceiling and various items in the living room indicated that an intense struggle had taken place. An envelope found near Kindred’s body bore a bloody footprint, which was later determined to match the known footprint of the appellant.
Aubrey Hughes, a friend and former boyfriend of the appellant’s, testified that the appellant often came by to see him at the garage where he worked. He testified that on one such occasion, the appellant, who was accompanied by her husband, James Bailey, told him that she and Bailey had killed a retired fireman. Hughes testified that the appellant told him that she had met the victim through a dating service, through which prostitutes were supplied to customers. The appellant told Hughes that she had been with the victim on a couple of occasions. Hughes testified that the appellant told him that on the night of the incident, she had gone to the victim’s home to “turn a trick.” Bailey went with her. The appellant explained to Hughes that she stabbed the victim with a knife when the victim grabbed James Bailey by the shirt. The appellant told Hughes that she had not reported the incident to the police because she was afraid.
On September 8, 1995, Matthew Thompson, a Mobile police officer, took an audio taped statement from the appellant, which was admitted into evidence at trial. According to the appellant, on June 7, 1995, the dating service that she worked for telephoned her and asked her to contact Kindred. When the appellant telephoned Kindred he asked her to come to his house around midnight and to bring some beer with her.
The appellant stated that Bailey thought that she should get more than her usual $150 from Kindred. She stated that Bailey suggested to her that he could knock Kindred unconscious and they could then take more money. The appellant told the police that she knew where Kindred kept his money. The appellant and Bailey drove in the appellant’s automobile to Kindred’s home. The appellant stated that on the way to Kindred’s home, Bailey told her that he would kill Kindred, if it became necessary. She claimed that she asked Bailey not to kill Kindred.
When the appellant arrived at Kindred’s home, she observed an unfamiliar car in Kindred’s driveway. The appellant then drove to a service station, where she telephoned Kindred and asked him about the vehicle parked in his driveway. Kindred told the appellant that the vehicle belonged to his daughter. The appellant purchased some beer and returned to Kindred’s home.
When the appellant and Bailey arrived at Kindred’s home, the appellant went into the house, and Bailey remained in the vehicle. Kindred was dressed in a robe and sitting in a recliner, waiting for the appellant. He was positioned with his back to the front door. The appellant placed the beer in the refrigerator and got undressed. The appellant stated that the date then “progressed.”
*509 The appellant told the police that while she was kneeling in front of Kindred, she heard the front door open. The appellant thought that Kindred had also heard the noise, so she distracted him. She said that she was very frightened. Bailey entered the living room and began to hit Kindred on the back of the head with a billyclub. The appellant told the police that both she and Kindred were shocked.
The appellant stated that Bailey continued to hit Kindred, but that Kindred did not lose consciousness. While Bailey was hitting Kindred, the appellant got dressed. She stated that during the struggle, Kindred yelled for someone named “Amber.” The appellant said that around that same time, she thought she heard a door opening. She went down the hall to investigate. When she opened the bedroom door, she saw a woman lying on the bed, with her back to the door.[1]
The appellant returned to the living room. Bailey continued to hit Kindred, but Kindred still did not lose consciousness. The appellant stated that Kindred grabbed Bailey’s shirt. The appellant told the police that Kindred’s actions frightened her because, she said, she was afraid that the woman that she had seen in the bedroom was going to come out and discover them. The appellant pulled out of her purse a knife that she kept for protection. She told the police that she thought that if she stabbed Kindred, he would think about the pain and “hush.” The appellant said that she stabbed Kindred in the chest below his left nipple and he fell over the recliner.
The appellant stated that after she stabbed Kindred, she threw the knife down and went into the bathroom. She said that when she came out of the bathroom, Bailey was holding the knife. The appellant denied any knowledge of a second stab wound. The appellant told the police that she and Bailey then left Kindred’s home without taking anything. She maintained that when they left, Kindred was still alive. The appellant suggested to the police that Kindred’s wife “finished off’ Kindred after she and Bailey left the house.
The appellant and Bailey returned to their apartment, where she took a shower. The appellant stated that she and Bailey threw the knife into the sewer, and that they burned her clothes, Bailey’s clothes, and the billy-club in a barrel. She claimed that she never intended to hurt or to kill Kindred.
James Bailey also gave a statement to the police. According to the officer who took the statement, Bailey admitted that robbing Kindred was his idea, but he claimed that the appellant agreed to the plan. He told the police that the appellant instructed him on the layout of Kindred’s house and where Kindred would be sitting when he entered, and that she also signaled to him to indicate when he could approach Kindred and hit him. Bailey told the police that he saw the appellant stab Kindred twice.
At the conclusion of the state’s case, a discussion ensued regarding the appellant’s request to charge the jury on manslaughter. The trial court indicated that the evidence did not support a manslaughter charge; however, the trial court indicated that it would revisit its decision after all of the evidence had been presented.
The appellant testified in her defense. Her trial testimony was similar to her statement to the police. She testified that she had worked for various dating services since she was 14 years old. She said that on the night of the incident, the dating service telephoned her and told her that she had a date with Kindred. The appellant testified that she had “dated” Kindred before, and that he was a good man. The appellant said that she telephoned Kindred and agreed to the date. She testified that Bailey initially did not want her to meet Kindred, but then he concocted the idea to rob Kindred. She said that Bailey planned to hit the victim on the head and get some additional money. The appellant claimed that she never agreed to rob Kindred and that she did not intend to hurt him. *510 The appellant testified that when she arrived at Kindred’s house, she realized that she had forgotten to get beer. She and Bailey left to purchase the beer. After doing so, she returned to Kindred’s house, got out of the car, and went into the house. The appellant testified that she did not think Bailey was going to follow through with the robbery because Bailey remained in the car.
The appellant said that as the date was progressing, she thought that she heard Bailey enter the house through the front door. She claimed that by the time she heard the noise, it was too late to warn Kindred. The appellant testified that Bailey began to hit Kindred, and that Kindred and she were shocked.
The appellant testified that she was frightened and did not know what to do. During the struggle between Kindred and Bailey, Kindred called out for his wife. The appellant went to one of the bedrooms and discovered Kindred’s wife lying on a bed, with her back to the door. When she returned to the living room, Kindred and Bailey were still struggling. The appellant testified that she tried, without success, to intervene in the struggle between Kindred and Bailey. She said that as she was getting dressed, she knocked her purse off the table. As she was putting the contents back into her purse, she saw the knife. The appellant testified:
“I just wanted this over with. He [Kindred] had suffered enough and James had just went completely AWOL. It was not going like it should have, so, you know, I get up, you know, and I think, well, maybe if I just tell Mr. Ken to just sit down and shut up and be calm, everything would be all right, but he wasn’t doing that and James wasn’t letting off neither, so Mr. Ken, he, you know — you know, he had got so he tore James’s shirt and they had really gotten into it, so anyway, he started to come at me. He was mad. He wanted to know why this was happening. He wanted to know, you know — because like I said, he had been so good to me over the years and I just thought, well, maybe— maybe if I could just get him under control, maybe if I could just get him down and get him in control, all of this would be all right, and so he had turned toward me and I thought, well, maybe he just — if he would just — if he would just — if it was just over with, he’d be all right, that we could go and it would just be all over with, so— so I just lunged at him thinking maybe if he would think of, you know — pay attention to that, he would just try to sit down and calm down.”
(R. 272-73.)
The appellant testified that after she stabbed Kindred, she and Bailey left. When she got to the car, she realized that she had left her shoes in the house. The appellant testified that when she went back into Kindred’s home to retrieve her shoes, Kindred grabbed her by the leg and tried to tell her something, but she ran out of the house. The appellant claimed that she wanted to telephone for help, but that Bailey would not agree to it. She admitted that they burned their clothes and the billyclub and that they disposed of the knife.
James Bailey, who pleaded guilty to murder before the appellant’s trial, testified in rebuttal. He testified that on the night of the incident, he accompanied the appellant to Kindred’s house. Bailey said that he followed the appellant into the house, where he hid and waited for the appellant to signal him. Bailey testified that when the appellant signaled, he emerged from hiding and hit Kindred several times in the head with a nightstick. Bailey testified that the appellant also hit Kindred with a lamp. He said that he did not see the appellant do anything else to Kindred. Bailey stated that when they arrived at their apartment, the appellant showed him a bloody knife and told him that she had stabbed Kindred.
At the conclusion of all the evidence, the trial court again denied the appellant’s request for a charge on manslaughter as a lesser-ineluded offense, on the basis that there was no evidence to support such a charge.
Although the appellant does not specifically state so, the inference from her argument, both at trial and in her brief to this Court, is that the trial court erred in refusing to charge the jury on reckless manslaughter. *511 See § 13A-6-3(a)(1), set forth above. We disagree.
“Generally, a trial court should instruct the jury on a lesser offense if there is a reasonable theory from the evidence to support that lesser offense. Ex parte Stork, 475 So.2d 623, 625 (Ala.1985). However, a trial court may properly refuse to instruct on a lesser offense when it is ‘clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense.’ Stork, 475 So.2d at 625.”
Jones v. State, 656 So.2d 414, 415 (Ala.Cr.App.1994).
Section 13A-2-2(l) provides that “[a] person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or to engage in that conduct.” (Emphasis added.) The evidence in this case clearly established that the appellant’s conduct was intentional.
The evidence presented at trial established that the appellant and her husband discussed robbing the victim before they went to the victim’s house. At the very least, the appellant was aware that a robbery might take place during the course of her date with the victim. The appellant’s husband entered the victim’s house with the intent to rob and possibly kill the victim, and the appellant did nothing to warn the victim or to stop events as they were unfolding. When the plans went awry, and the victim refused to yield, the undisputed evidence established that the appellant pulled a knife and intentionally stabbed the victim near his heart. The appellant and her husband left the victim lying in a pool of blood, where'he was found by his mentally ill wife. “Such conduct under the facts in this case is consistent with intentional conduct, not reckless conduct.” Jones, 656 So.2d at 415. See also, Henderson v. State, 650 So.2d 532, 533 (Ala.Cr.App.1994) (wherein this Court held that a charge on reckless manslaughter was not warranted where “[t]he evidence ... tended to show that the appellant repeatedly stabbed the victim”); Smith v. State, 588 So.2d 561 (Ala.Cr.App.1991) (wherein this Court held that a reckless manslaughter charge was not required despite the defendant’s claim that he and his accomplice intended only to wound or to frighten the victim, because the evidence established that the defendant’s conduct toward the victim was intentional and “[t]he only evidence introduced that tended to show that the appellant believed that the victim was only to be assaulted and frightened clearly related to the initial phases of the accomplices’ planning.” 588 So.2d at 575). Compare, Bunn v. State, 581 So.2d 559, 561 (Ala.Cr.App.1991) (wherein this Court held that a reckless manslaughter charge was warranted due to the “unexpected nature of the confrontation, the appellant’s efforts to avoid the confrontation, his lack of familiarity with the pistol, -his concern for the victim after the victim was shot, coupled with his testimony that the pistol ‘went off,’ [the fact] that he did not remember pulling the hammer back,” and the fact that he told people that the shooting was an accident.)
After a careful review of the record, we find no error in the trial court’s refusal to charge on reckless manslaughter; the evidence simply did not support such a charge. The appellant’s conviction is therefore affirmed.
AFFIRMED.
All the Judges concur.

. According to the police, the woman the appellant saw was Kindred’s wife. She suffered from mental problems.